**MITSUBISHI ELECTRIC CORPORATION, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Motorola, Inc., Defendant–Intervenor.**

**Court No. 85–12–01858.**

United States Court of International Trade.

Oct. 31, 1988.

---

Baker & McKenzie, Thomas P. Ondeck and B. Thomas Peele, Washington, D.C., for plaintiff Mitsubishi Elec. Corp.

Paul, Weiss, Rifkind, Wharton & Garrison, Robert E. Montgomery, Jr., Linda N. Valenstein and George Kleinfeld, Washington, D.C., for plaintiffs NEC Corp. and NEC America, Inc.

Wilmer, Cutler & Pickering, John D. Greenwald, Robert C. Cassidy, Jr. and C. Loring Jetton, Jr., Washington, D.C., for plaintiff OKI Elec. Industry Co., Ltd.

Weil, Gotshal & Manges, A. Paul Victor, Charles H. Bayar, New York City, and Jeffrey P. Bialos, Washington, D.C., for plaintiffs Matsushita Communication Indus. Co., Ltd., Matsushita Communication Corp. of America and Panasonic Indus. Co., Div. of Matsushita Elec. Corp. of America.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Sheila N. Ziff, Douglas A. Riggs, Gen. Counsel, M. Jean Anderson, Chief Counsel for Intern. Trade Office of the Deputy Chief Counsel for Import Admin., U.S. Dept. of Commerce (Eileen P. Shannon, of counsel), and Michael P. Mabile, Asst. Gen. Counsel, U.S. Intern. Trade Com'n, Washington, D.C., (Judith M. Czako, of counsel), for defendant.

Covington & Burling, Harvey M. Applebaum, Paul G. Gaston, Sonya D. Winner, Washington, D.C., and David F. Hixson, of counsel, for defendant-intervenor Motorola, Inc.

## OPINION AND ORDER

CARMAN, Judge:

This consolidated action concerns five separately filed actions before the Court: *Mitsubishi Electric Corp. v. United States,* Court Nos. 85–12–01858 and 86–01–00113; *NEC Corporation and NEC America, Inc. v. United States,* Court No. 86–01–00100; *OKI Electric Industry Co., Ltd. v. United States,* Court No. 86–01–00099; and *Matsushita Communication Industrial Co., Ltd., et al. v. United States,* Court No. 86–01–00088. Motorola, Inc. has entered as defendant-intervenor. All of the actions involve appeals from the following administrative proceedings: (1) the final determination of the Department of Commerce, International Trade Administration (ITA) entitled *Cellular Mobile Telephones and Subassemblies From Japan; Final Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 45,447 (1985) (hereinafter *AD Final Determination*); (2) the final determination of the International Trade Commission (ITC) entitled *Cellular Mobile Telephones and Subassemblies Thereof From Japan,* USITC Pub. No. 1786, 50 Fed.Reg. 51,467 (1985); and the ITA's antidumping duty order entitled *Antidumping Duty Order: Cellular Mobile Telephones and Subassemblies From Japan,* 50 Fed.Reg. 51,724 (1985).

Two common questions of law involved in these consolidated actions concern:

(a) Whether the ITA's final determination of sales at less than fair value, (*AD Final Determination,* 50 Fed.Reg. 45,447 (1985)), to the extent that it encompassed certain CMT subassemblies and found they were being sold in the United States at less than fair value, was unsupported by substantial evidence on the record, arbitrary, capricious, an abuse of

discretion or otherwise not in accordance with law; and

(b) Whether the final determination of material injury issued by the ITC (*Cellular Mobile Telephones and Subassemblies Thereof From Japan*, USITC Pub. No. 1786, 50 Fed.Reg. 51,467 (1985)), to the extent that it held that an industry or industries in the United States were materially injured by reason of imports of CMTs and CMT subassemblies was unsupported by substantial evidence on the record, arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

See, Joint Motion For Consolidation at 2–3, *Mitsubishi Electric Corp. v. United States*, Consolidated Court No. 85–12–01858. The Court holds that the determinations by the ITA are supported by substantial evidence on the record and are in accordance with law, but remands the determination of the ITC for further findings in accordance with this decision.

### FACTS

Defendant-intervenor Motorola, Inc. (Motorola) filed an antidumping petition with the ITA and the ITC alleging that Japanese-manufactured cellular mobile telephones (CMTs), mobile transceivers and subassemblies imported as "kits" were being sold or likely to be sold at less than fair value (LTFV) in the United States, in contravention of 19 U.S.C. § 1673(1), and that a domestic industry had been materially injured, was threatened with material injury, and establishment of the industry was being materially retarded by imports of the merchandise.

The petition, *Cellular Mobile Telephones and Subassemblies Thereof From Japan* (petition), described the class or kind of merchandise to be covered under the petition as follows:

The class or kind of merchandise covered by this petition is all cellular mobile telephones manufactured in Japan, plus all mobile transceivers or kits of components and subassemblies manufactured in Japan for use in final assembly of cellular mobile telephones.

\*     \*     \*     \*     \*     \*

This petition also covers cellular mobile telephone transceivers sold alone and collections of cellular mobile telephone subassemblies ("kits"). The inclusion of mobile transceivers and kits in an antidumping order is essential to prevent the Japanese manufacturers from avoiding the impact of any final relief issued in this proceeding by simply importing mobile transceivers or kits containing most of the necessary subassemblies or components into the United States for final assembly and testing. Wherever this petition refers to cellular mobile telephones imported ·from Japan, those products should be understood to include also cellular mobile telephones made primarily using kits or mobile transceivers imported from Japan.

Administrative Record, Doc. No. 1 at 10–12, *Cellular Mobile Telephones and Subassemblies Thereof From Japan*, (Case No. A–558–405) (hereinafter Rec.Doc.).[1]

In the petition, Motorola supplied the purported tariff classification of the merchandise to be investigated by the ITA. Plaintiff submitted its request for relief be applied to the merchandise classified as follows:

D. *Tariff Classification*

Cellular mobile telephones probably should be imported under tariff classification TSUS 685.2943, which is merely a catch-all or clean-up classification. Transceivers, kits or subassemblies for such telephones probably should be imported under the same TSUS classification or perhaps under TSUS 685.2325, 685.2476, 685.2940. 685.2970, or 685.2976. However, *because cellular telephones did not exist when the present tariff classifications were created, and because the breadth and ambiguity of the existing tariff classifications may allow these products to enter without chal-*

---

**1.** The cellular mobile telephone at issue consists of a transceiver, a "dictionary-sized box of electronics that is usually mounted in an automobile trunk or under the seat," and a control unit which "resembles a modern electronic telephone." Rec.Doc. 1 at 11.

*lenge* under numerous different classifications, *it is essential that any relief provided in this proceeding apply* not only to imports under specific TSUS numbers, but also generally *to any cellular mobile telephones,* and *to any* transceivers, *kits or subassemblies for cellular mobile telephones, whatever the tariff classification* of such products.

Rec.Doc. 1 at 12–13 (emphasis added).

The petition also contained an explanation of the extent of Motorola's intent to include CMT subassemblies within the scope of the ITA investigation. The following sets forth Motorola's reasoning:

Apparently recognizing that their prices are at less than fair value, but nevertheless determined to charge such prices, several Japanese manufacturers have made preliminary plans to circumvent the law by creating the facade of manufacturing cellular mobile telephones in the United States; when in fact that 'manufacturing' uses kits (collections of key components) or mobile transceivers (containing roughly 80% of the cellular mobile telephone's electronics) that are made in Japan.

Even if the final assembly of the pieces of an OKI, Matsushita, NEC or Kokusai mobile telephone occurs in the U.S., those telephones are in reality manufactured in Japan, where they are conceived, financed, designed, engineered, and supervised and where their major subassemblies and components are designed and produced. The administration and ownership of the manufacturing effort, and the research, design, development and creation of components is the heart of the industry. To prevent a clear evasion of the antidumping law by the Japanese, it is essential that not only cellular mobile telephones, but also kits and mobile transceivers for cellular mobile telephones be covered by antidumping protection.

\* \* \* \* \* \*

... The inclusion of mobile transceivers and kits in an antidumping order is essential to prevent the Japanese manufacturers from avoiding the impact of any final relief issued in this proceeding by simply importing mobile transceivers or kits containing most of the necessary subassemblies or components into the United States for final assembly and testing.

*Id.* at 6–7, 11. The petition also contained a reference to a citation from an economic journal published in Japan which stated why some Japanese manufacturers of CMTs (specifically OKI, Matsushita, Mitsubishi, and NEC) were deciding to or considering the idea of trying to import subassembly pieces of CMTs into the United States to avoid antidumping charges on complete CMTs. *See id.* at 11 n. 1, App. K, *Car Telephone: Sales Battle Intensifies in Europe, U.S.,* June 29, 1984, Nihon Keizai Shimbun.

The petition also set forth allegations that "dumping margins of 50% are common, with some margins as high as 100%." *Id.* at 6. Motorola stated in the petition that bargain prices of CMTs would exist at a level of two thousand (2,000) dollars or less while Japanese manufacturers offered CMTs at a level of one thousand (1,000) dollars or less. *See id.* at 17, 41. Motorola also contended in its petition losses of fifty (50) million dollars in potential revenues had been lost to Japanese sales, *see id.* at 3, where "the U.S. industry currently supplies less than half of the U.S. market demand for cellular mobile telephones." *Id.* at 8.

Motorola also explained, under its classification section, its concern that the infancy of the industry would possibly not allow for the proper inclusion of the subject merchandise under established classifications and thus allow these products to be entered into the U.S. while evading the dumping relief sought by the domestic industry. *Id.* at 12–13.

On November 5, 1984, the ITC initiated its preliminary investigation on CMTs and subassemblies from Japan. *Cellular Mobile Telephones and Assemblies Thereof From Japan,* 49 Fed.Reg. 45,274 (1984). The ITA initiated its antidumping duty investigation on November 26, 1984 pursuant

to 19 U.S.C. § 1673a(c)(2), "to determine whether [CMTs] and subassemblies from Japan are being, or are likely to be, sold in the United States at less than fair value." *Cellular Mobile Telephones and Subassemblies from Japan,* 49 Fed.Reg. 47,076 (1984). The ITA defined the scope of the investigation as including subassemblies in general, not restricting the scope to subassemblies sold only in kits or collections. Specifically, the ITA set forth the scope of the investigation would cover subassemblies as defined as

> circuit modules and/or any other packaged functional assemblage of electronic components, dedicated for use in cellular mobile telephone transceivers or control units. Examples of such assemblies include audio processing modules, signal processing (logic) modules, RF modules, IF modules, synthesizers, duplexers, and power amplifiers.

Rec.Doc. 5 at 4.

On December 4, 1984, the ITA issued preliminary questionnaires to nine Japanese companies (Fujitsu, Hitachi, Ltd. of Japan (Hitachi), Japan Radio Corp., Kokusai Electric Co., Ltd., Matsushita, Mitsubishi, NEC, OKI, and Toshiba), which Motorola had targeted as foreign companies dumping CMTs. Rec.Docs. 18–26. Toshiba reported in its response that it sold a small quantity of kits, and NEC, OKI, and Matsushita reported in their responses sales of subassemblies to the United States. Rec.Docs. 31, 38, 42, 43.

Mitsubishi responded that it had sold CMTs only to the United States and Sweden, and had made no sales in the home market between June 1 and November 30, 1984, the period covered by the investigation. It indicated that it had supplied Nippon Telegraph and Telephone Company with sample units of transceivers "for testing purposes". Rec.Doc. 37 at 2.

The ITA decided to investigate six companies which could provide substantial coverage of sales of CMTs and subassemblies: Hitachi, Matsushita, Mitsubishi, OKI, Toshiba and NEC. Rec.Docs. 15, 16, 69, 70.

Fujitsu, Matsushita, NEC, and OKI, respondents to the investigation, objected to the ITA's inclusion of discrete subassemblies within the scope of the investigation throughout the investigation proceedings. *See e.g.,* Rec.Docs. 35, 41, 43, 189, 300, 303, 307, 308.

On December 18, 1984, the ITC determined by a 4 to 1 vote (Commissioner Leibeler dissenting) that there was a reasonable indication that an industry or industries in the U.S. were materially injured or threatened with material injury by reason of imports of CMTs and subassemblies from Japan allegedly sold in the U.S. at less than fair value, pursuant to 19 U.S.C. § 1673b. *Cellular Mobile Telephones And Subassemblies Thereof From Japan (Preliminary Investigation),* USITC Pub. No. 1629 (1984), 49 Fed.Reg. 50,316 (1984).

Throughout the investigation, Motorola also submitted to the ITA several submissions countering the objections of the six respondent companies concerning discrete subassemblies. On January 15, 1985, Motorola expressed its desire to the ITA to clarify the intent of the petition was to cover sales of discrete subassemblies; and to express it reaffirmed the ITA's and the ITC's determinations that "subassemblies are properly part of [the] investigation." Rec.Doc. 46 at 2. Motorola also emphasized in its submission the "petition by its title specifically covers subassemblies." *Id.* at 5.

Motorola, in the petition reiterated its concern of including subassemblies within the scope of the investigation to prevent Japanese companies from evading and contravening the antidumping law of the U.S. Motorola expressed its intent not to include "instances in which an independent manufacturer exports a single, simple subassembly for sale to an unrelated U.S. manufacturer, [but] ... to indicate ... that the object is imports of the different subassemblies that considered together make up 'most of the necessary subassemblies' for the CMT." *Id.* at 3–4, 5–6. Motorola continued that "[w]hether such subassemblies are packaged together or discretely for shipment, they clearly fall within the pa-

544

rameters and intended scope of the petition." *Id.* at 6.

Motorola also pointed out:

The only reason that Motorola included subassemblies in its petition was its *well-founded apprehension that failure to do so would permit evasion of an antidumping duty order by Japanese producers,* who would bring major subassemblies into the U.S., claiming that they were not cellular mobile telephones, and then would perform the relatively minor final assembly in the United States.

\* \* \* \* \* \*

... The dumping of transceivers or of collections of major subassemblies ... for final assembly in the United States does or would result in the same injurious impact on the U.S. industry as dumping of completed cellular mobile telephones.

\* \* \* \* \* \*

Motorola does not seek to include in this proceeding minor subassemblies and components ... but rather those *major subassemblies that would typically constitute 5% or more of the material cost of the product* ....

ITC Rec.Doc. 46 at 27–29 (emphasis added).

On January 25, 1985, Motorola stated, in submitted comments, its concurrence with the ITA's determined scope of the investigation, and on February 21, 1985, Motorola suggested slight modification of the ITA's definition of subassemblies and housing within the scope of the investigation. Rec. Doc. 54 at 12, 83.

Motorola's February 21, 1985 letter also stated: "[t]he petition covers transceivers, control units, and other subassemblies described in the proposed definition above, whether they are imported separately, in sets, or in bulk." Rec.Doc. 83 at 6. Motorola also pointed out only substantial sales of subassemblies consisted of exports from Japanese manufacturers to their U.S. subsidiaries. The only sales Motorola did not intend to cover, Motorola continued, were isolated sales of single subassemblies "on the open market from ... unrelated manufacturers in Japan", unless there were ad-

ditional sales of other subassemblies which together constituted a significant portion of a CMT or transceiver, or each isolated sale consisted of a large subassembly which by itself accounted for a significant portion of a CMT or transceiver. *Id.* at 7–8.

The ITA mailed questionnaires to the six investigated companies in the early part of February, 1985. Rec.Docs. 59–63, 70. The questionnaires requested sales and cost information for the merchandise under review covering a time period of June 1, 1984 through November 30, 1984. The ITA indicated that although the merchandise investigated was the same as initially announced in the notice of initiation, the product description of subassemblies was still under investigation.

Concerning the sales information requested, the questionnaires contained what constituted a sale. A *sale* was defined as follows:

Any sale whose date of sale falls within the period of investigation is subject to investigation. For our purposes, the sales are dated from the point in the transaction where the basic terms of the contract are known and the price to be paid is determined. It is not the date on which the actual price is paid, since that ultimate price may have been influenced by events beyond the control of both parties, such as fluctuations in exchange rates. The date of sale is thus the date on which the agreed-upon price is confirmed. The term 'sale' also includes leasing arrangements which are entered into during the period of investigation.

Rec.Doc. 64 at 39.

On February 13, 1985, Commerce sent the respondents a follow-up letter clarifying certain aspects of the questionnaire, including which sales were under investigation and the definition of "date of sale":

This investigation covers any sale whose 'date of sale' falls within the period of investigation.... Additionally, as a point of further clarification, please note that the 'date of sale' is that point in the transaction where all the terms are finally determined. Any subsequent change,

or addition to, the terms of a contract would constitute a new 'date of sale.' Thus, even if a contractual agreement was entered into prior to the period of investigation, if any of the terms of that agreement are modified or altered in any way within the period of investigation, we would consider these contract modifications to be 'sales' which must be reported.

Examples of changes which would alter the date of sale under a typical contract would be:

—Prices which are subject to ongoing negotiation;

—Volume and terms subject to renegotiation;

—Product improvements, feature changes and model changes;

—Additional or changed

Warranty guarantee or servicing arrangements;

Financing arrangements;

Delivery terms;

Lease/rental programs;

Rebate agreements.

Rec.Docs. 71–76.

Hitachi, Mitsubishi, NEC, OKI and Toshiba submitted responses between March 18 and April 19, 1985. Rec.Docs. 116, 117, 119, 121, 142, 155, 160, 164, 169. Sales or exports of subassemblies were reported by three of the companies. Hitachi indicated it had minor sales of certain spare CMT modules to an unrelated U.S. company for use in a repair and warranty program. Rec.Doc. 277 at 7. NEC responded that it exported subassemblies to a wholly-owned subsidiary in the United States manufacturing CMTs and sold spare kits and accessory kits in the United States. Rec.Docs. 38, 171, 291. Oki indicated it sold subassemblies to a related manufacturer of CMTs in the United States. Rec.Docs. 119, 182, 310. Mitsubishi indicated sales of CMTs to only the United States and Sweden in its response and subsequent amendments to the response. Rec.Docs. 116, 155. The ITA verified the five responses in the several offices of companies in the United States and Japan in April, May and June of 1985. Rec.Docs. 188, 257, 263, 267, 288–289, 295, 322.

An analyst at the ITA discovered, during the verification proceedings, that Mitsubishi had made sales of CMT transceivers in the home market during the period of investigation which sales it had failed to report. The analyst also ascertained that Mitsubishi had qualified as a supplier of CMTs for Nippon Telephone and Telegraph Company (NTT) during the period of investigation. Rec.Doc. 257 at 23. The analyst verified Mitsubishi had shipped test samples of transceivers to NTT's subsidiary in August and September of 1984, as it had reported in its preliminary questionnaire response. Mitsubishi received compensation for the samples in November 1984. *Id.* at 25. The analyst from the ITA also discovered other sales of transceivers to NTT's subsidiary in Japan. He examined three purchase orders dated within the period covered by the investigation and noted the purchase orders contained the date of order, date of delivery, quantity, unit price and total price. *Id.* at 24–27.

Although the analyst from the ITA did not discover any documents in which Mitsubishi had formally accepted the orders, his report indicated Mitsubishi's headquarters and plant had issued production orders for the same merchandise which was included in the sales in May 1984. The orders showed the beginning and final delivery dates of the merchandise, the total approximate price, estimated cost of sale, the customer, and the total quantity. The date of the customer order was left blank on the forms. Rec.Doc. 257 at 25–26. The analyst noted Mitsubishi officials claimed Mitsubishi issued production orders "at its own risk" based on anticipated sales orders from the NTT subsidiary. *Id.* at 25.

On May 24, 1985, Motorola submitted comments about Matsushita and NEC. It reiterated its stance any determination issued by the ITA from its investigation should include "all [CMTs], transceivers, control units, and subassemblies for CMTs manufactured by [the Japanese manufacturers] and imported into the United States." Rec.Doc. 202 at 3–4.

Motorola also commented on the controversy of the inclusion of the subassemblies. Those observations were as follows:

> there is often a necessity for flexibility as the Department determines the best and most practicable method of applying the antidumping law to the products identified in the petition. In this case, subassemblies were clearly included in the petition, which was titled *"Cellular Mobile Telephones and Subassemblies Thereof from Japan,"* and while the investigation may have shown that the packaging of some of those subassemblies was somewhat different than Motorola's understanding, subassemblies were clearly a target of the petition and thus are properly within the scope of the investigation.

Rec.Doc. 309 at 81. Motorola also responded to a request from Matsushita that replacement parts be excluded from the investigation. Motorola stated "the Department should accede to Matsushita's request only if it is fully satisfied that 'repair' subassemblies are so easily and verifiably distinguishable from 'production' subassemblies that there is no possibility of circumvention of an antidumping duty order." Rec.Doc. 309 at 92.

On June 11, 1985, the ITA published its affirmative preliminary determination "that cellular mobile telephones and subassemblies from Japan [were] being, or [were] likely to be,. [sic] sold in the United States at less than fair value." *Cellular Mobile Telephones and Subassemblies From Japan; Preliminary Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 24,554 (1985). The ITA explained the scope of the investigation as follows:

> The products covered by this investigation are cellular mobile telephones (CMTs), CMT transceivers, CMT control units, and subassemblies dedicated for use in CMTs. CMTs are radio-telephone equipment designed to operate in a cellular radio-telephone system, i.e., a system that permits mobile telephones to communicate with traditional land-line telephones via a base station, and that permits multiple simultaneous use of partic-

ular radio frequencies through the division of the system into independent cells, each of which has its own transceiving base station. Each CMT generally consists of (1) a transceiver, i.e., a box of electronic subassemblies which receives and transmits calls; and (2) a control unit, i.e., a handset and cradle resembling a modern telephone, which permits a motor-vehicle driver or passenger to dial, speak, and hear a call. They are designed to use motor vehicle power sources. Cellular transportable telephones, which are designed to use either motor vehicle power sources or, alternatively, portable power sources, are included in this investigation.

> Subassemblies are any completed or partially completed circuit boards, circuit modules and/or any packaged assemblage of electronic components, the value of which is equal to or greater than five dollars, and which are dedicated for use in CMT transceivers or control units. Examples of such subassemblies are circuit boards and/or modules containing any of the following circuitry or combinations thereof: audio processing, signal processing (logic), RF, IF, synthesizer, duplexer, power supply, power amplification, transmitter, and exciter.

*Id.* at 24,554–55.

The ITA also set forth its reasoning concerning the inclusion of subassemblies within the category of products investigated. The ITA stated:

> [t]he determination to include subassemblies within the scope of the investigation was based on the need to prevent circumvention of any antidumping order on CMTs through the importation of major CMT subassemblies, and the Department's broader conclusion that the investigation properly should include subassemblies. In this regard, Motorola's petition requested that we include 'kits of components and subassemblies' in the investigation.

> Two of the companies investigated export CMT subassemblies to the United States to related companies which subsequently perform some form of further

manufacture or assembly before selling the completed CMTs to unrelated parties. If the investigation were limited to completed CMTs alone, none of these importations would be subject to an antidumping order, even if all of the subassemblies were of Japanese origin and were being sold at less than fair value, and the complete CMT was 'substantially' of Japanese origin.

*Id.* at 24,555.

The ITA also published its positions on respondents' arguments the ITA has no authority to include separately imported discrete subassemblies within the scope of the investigation. The ITA responded as follows:

First, the Department [ITA] takes the position that CMT subassemblies are the same 'class or kind' of merchandise as complete CMTs. This determination is based on a consideration of the following factors: (1) General physical characteristics, (2) the expectations of the ultimate purchaser, (3) the ultimate use of the merchandise in question, and (4) the channels of trade in which the merchandise moves. Since the scope of this investigation only includes those subassemblies that are 'dedicated for use' in complete CMTs, both the ultimate use and the ultimate purchaser of the CMT subassemblies are the same as for the complete CMTs. Thus, the second and the third criteria outlined above are met. Similarly, based on the evidence in the record, the Department determines that CMT subassemblies, as defined in this investigation and complete CMTs move in the same channel of trade. Indeed, this is the very reason the Department feels it necessary to include CMT subassemblies within the scope of this investigation since otherwise any resulting order could easily be circumvented. With respect to the first criterion, the Department does not think that the fact that CMT subassemblies have, in some respect, different physical characteristics from complete CMTs should be controlling in this instance. As a result, the Department concludes that CMT subassemblies which are dedicated for use in

CMTs are within the same 'class or kind' of merchandise as complete CMTs. See, *Antidumping Order; Cell Site Transceivers from Japan,* 50 FR 307.

Second, the Department's view is that respondents are taking an unduly narrow reading of the petition and that the Department's definition of scope is simply a clarification of what was set forth in the petition. Petitionerss [sic] definition of kits referred to collections of 'key' compoenents, [sic] which we have taken to mean 'major' subassemblies. The whole purpose of including subassemblies in this investigation is to prevent evasion of the antidumping law. It would be illogical to make a distinction between those subassemblies that are shipped discretely in separate containers and those that are shipped together in one box. Limitations as to packaging would simply be an invitation to evade the antidumping law through changes in packaging.

Third, whether or not Motorola's petition explicitly covers discrete subassemblies is not dispositive, since the Department has an inherent power to establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent. See, 19 CFR 353.37(b).

\*    \*    \*    \*    \*    \*

Finally, the Department has considered respondents' (principally Matsushita's and OKI's) suggestion that the order be designed so as to exclude importations of subassemblies that are incorporated into CMTs by U.S. facilities that add more than a nominal value. It was proposed, for example, that each respondent be given an opportunity to make an affirmative showing that the value it adds in the United States to imported CMT subassemblies is so substantial that it ought to be removed from the scope of the order. The Department feels that this approach is not feasible from an administrative standpoint, and that it would result in a discriminatory application of the antidumping law.

Accordingly, the Department has included CMT subassemblies as defined

above within the scope of the investigation.

*Id.* at 24,555-56.

The ITC instituted its injury investigation following the ITA's affirmative preliminary determination. The ITC investigation concerned whether or not a domestic industry was materially injured, threatened with material injury, or the establishment of a domestic industry was materially retarded, by reason of less than fair value imports of CMTs and subassemblies from Japan. During this investigation, the ITC mailed out questionnaires to known domestic producers, known importers of CMTs and subassemblies, and purchasers of CMTs in the domestic market. The ITC also sent out investigators to visit the various facilities of those questioned and gathered information.

On October 31, 1985, the ITA published its final affirmative determination on the CMTs. *AD Final Determination,* 50 Fed. Reg. 45,447 (1985). The ITA determined CMTs and subassemblies from Japan were being or were likely to be, sold in the U.S. at less than fair value pursuant to 19 U.S. C. § 1673d(a). The weighted average margin percentage of dumping found for the certain manufacturers/sellers/exporters were as follows: OKI, 9.72; Hitachi, 2.99; Mitsubishi, 87.83; NEC, 95.57; Matsushita, 106.60; and Toshiba, 0.0. *Id.* at 45,460.

The ITA's published notice reiterated a substantial amount of its reasoning from its preliminary determination notice published in December of 1984. The final determination covered, inter alia, CMT subassemblies, the definition of which the ITA further clarified as follows:

Subassemblies are any completed or partially completed circuit modules, the value of which is equal to or greater than five dollars, and which are dedicated exclusively for use in CMT transceivers or control units. The term 'dedicated exclusively for use' only encompasses those subassemblies that are specifically designed for use in CMTs, and could not used [sic], absent alteration, in a non-CMT device. The Department selected the five dollar value for defining the

scope since this is a value that it has determined is equivalent to a 'major' subassembly. The Department feels that a dollar cut-off point is a more workable standard than a subjective determination such as whether a circuit module is 'substantially complete.' Examples of subassemblies which may fall within this definition are circuit modules containing any of the following circuitry or combinations thereof: audio processing, signal processing (logic), RF, IF, synthesizer, duplexer, power supply, power amplification, transmitter, and exciter. The presumption is that CMT subassemblies are covered by the order unless an importer can prove otherwise. An importer will have to file a declaration with the Customs Service to the effect that a particular CMT subassembly is not dedicated exclusively for use in CMTs or that the dollar value is less than $5, if he wishes it to be excluded from the order.

*Id.* at 45,448. The period of the investigation was June 1, through November 30, 1984.

Concerning the ITA's method of calculating United States price for OKI's subassemblies, the ITA stated in the determination:

For OKI, we used exporter's sales price (ESP) to represent the United States price because the merchandise was sold to unrelated purchasers after importation into the United States. For these sales, we made deductions, where appropriate, for foreign inland freight and handling charges, air or ocean freight, U.S. customs duties, U.S. inland freight and brokerage, indirect selling expenses incurred in the United States and other direct selling expenses incurred in the United States such as credit, advertising reserve, warranties and post-sale warehousing. In calculating the ESP for OKI, we also deducted the value added to the imported units through further manufacture prior to sale in the United States.

*Id.* at 45,450

The ITA, along with its other calculations, calculated the United States price

and foreign market value for Matsushita's subassemblies from information in the petition as the best information available because Matsushita did not respond to the ITA antidumping questionnaires.

Mitsubishi submitted comments to the ITA during the proceedings arguing, *inter alia*, the ITA should not use Mitsubishi home market sales as a basis for foreign market sales because they were inadequately small in relation to its third country sales. Mitsubishi supported its assertion with the following:

1. That MELCO's [Mitsubishi] shipment of a small quantity of test samples to Nippon Telephone and Telegraph (NTT) were not sales made in the ordinary course of trade; 2. that the informal and unwritten agreement between MELCO and NTT could not constitute a sale; and 3. that NTT's written purchase orders did not constitute 'sales' since MELCO did not 'confirm' these purchase order [sic], nor did title to the goods pass at that point, and therefore no sales occurred until MELCO actually delivered the CMTs. MELCO also argues that its home market sales of CMTs were not 'such or similar' to its U.S. sales within the meaning of 771(16)(C) of the Act.

*Id.* at 45,451.

The ITA responded to these arguments as set forth below:

The [ITA] has determined that, based on 3 NTT purchase orders, MELCO [Mitsubishi] made sufficient commercial sales in the home market during the period of investigation so as to constitute a 'viable' home market within the meaning of 19 CFR 353.4. In reaching this determination the [ITA] did not have to determine whether the sale of test samples to NTT were sales made in the ordinary course of trade since its finding would be the same regardless. The [ITA] has determined that the date purchase orders were issued by NTT is the appropriate date for determining date of sale. As the [ITA] stated in its questionnaire in this case, 'sales are dated from the point in the transaction where the basic terms of the contract are known and price to be paid is determined.... The date of sale is thus the date on which the agreed-upon price is confirmed.' All of these conditions were met when NTT issued purchase orders to MELCO. Under the [ITA's] definition, there is no requirement that title to the goods pass. Furthermore, the fact MELCO did not 'confirm' the purchase orders is irrelevant since it does not appear that there was any requirement or understanding that it would do so. The fact that subsequent shipping and invoicing by MELCO (absent confirmation) was done in accordance with the terms of each purchase order is further indication that these orders were an accurate confirmation of the parties' understanding.

Furthermore, the [ITA] has determined that MELCO's home market sales of CMT transceivers were 'such or similar' to its U.S. CMT sales.... Thus, under the [ITA's] analysis, MELCO's home market CMT sales during the period of investigation were in excess of five percent of its third country sale and therefore its home market was 'viable' within the meaning of 19 CFR 353.4.

*Id.*

The ITA, following the above rationale, excluded from its calculation of U.S. price all Hitachi shipments made *during* the investigation because requirements contracts entered into by Hitachi were concluded prior to the investigation. The ITA explained its reasoning as follows:

[The ITA has] carefully examined the terms of Hitachi's requirements contract and have determined that the date was [sic] executed should be used as the appropriate date of sale for purposes of determining when a U.S. sale was made. This decision is based on three factors. First, the requirements contract was a binding agreement as of the date it was entered into.... Second, by the terms of the contract, the price of the CMT was agreed to irrevocably. Third, while the number of CMTs to be sold was not precisely set at the date the contract was executed, the quantity was established at that time in the sense that the customer agreed to purchase all of the CMTs that

it may 'require' for a specified period of time. Thus, there is nothing more that the parties to the contract needed to agree to. The actual quantity purchased was to determined [sic] by factors outside their control, such as marked [sic] forces....

*Id.* at 45,456.

On December 17, 1985, the ITC published notice it had determined:

[o]n the basis of the record developed in the subject investigation, ... [and] pursuant to section 735(b)(1) of the Tariff Act of 1930 (19 U.S.C. 1673(b)(1)) ... industries in the United States are materially injured by reason of imports from Japan of cellular mobile telephones and subassemblies thereof, provided for in items 685.28 and 685.32 of the Tariff Schedules of the United States, which have been found by the Department of Commerce to be sold in the United States at less than fair value (LTFV).

*Cellular Mobile Telephones and Subassemblies Thereof From Japan,* 50 Fed. Reg. 51,467–68 (1985) (footnotes omitted). Vice Chairwoman Liebeler dissented in the determination.

In its publication of the determination, the ITC noted the following:

We recognize that there are many complexities in this investigation, including the relatively recent commencement of production of CMTs for the U.S. market, the rapid expansion of the U.S. market, the entry of new domestic producers throughout the period of investigation, and the assessment of the impact of imports on these particular industries. Although many of the indicators relevant to the condition of the domestic industries are positive and show improving trends, the domestic industries producing CMTs and subassemblies are showing financial losses and firms in the domestic industry have experienced declining employment or have chosen to cease production of CMTs and subassemblies. We have concluded that the LTFV sales of Japanese CMTs and subassemblies have had a negative impact on the performance of the domestic industry sufficient to find material injury by reason of such imports.

*Cellular Mobile Telephones and Subassemblies Thereof From Japan,* USITC Pub. No. 1786 at 3 (Dec.1985).

The ITC also stated in the publication its intended scope of investigation for the subject merchandise, as set forth below in pertinent part:

The domestic industry in a title VII investigation consists of the 'domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product.' Section 771(10) defines like product as 'a product which is like or, in the absence of like, most similar in characteristics and uses with, the article subject to an investigation....'

The imported merchandise which is the subject of this investigation are CMTs and subassemblies of CMTs.

*       *       *       *       *       *

In this investigation there are also imports of CMT subassemblies. These subassemblies 'compartmentalize' certain functions common to every CMT. The basic functions incorporated into one or more of the major subassemblies include: audio processing, signal processing (logic), frequency transmitting, frequency receiving, frequency comparing (synthesizing), duplexing (enabling sending and receiving at the same time), and power amplifying.

We determine that subassemblies dedicated to the performance of each of the essential functions of a complete CMT constitute a separate like product. In addition to the obvious differences in terms of physical characteristics, various subassemblies are not substitutable or interchangeable because each has a specific function in the transceiver or control unit and each firm's allocation of function between various subassemblies varies. Each of the subassemblies at issue is necessary to the function of the complete unit. These subassemblies, however, represent a prior stage of produc-

tion, and thus the amount of further processing is extensive.

*Id.* at 3–4, 6–8 (footnotes omitted).

The ITC explained its findings with respect to domestic producers, domestic industries and related parties. The explanation is set forth, in pertinent part, as follows:

Based upon our analysis of the factors set forth above, we determine that those firms producing transceivers or control units in the United States are domestic producers within the meaning of section 771(4)(A). In addition, we determine that certain Japanese firms that have commenced significant production-related activity in the United States are also domestic producers as of the time when a specific firm commenced those activities in the United States. We note, however, that based on our discussion of related parties that follows, these firms have been excluded from our analysis regarding injury to the domestic industry over the entire period of the investigation.

\* \* \* \* \* \*

With regard to the Japanese-owned firms that we found to be domestic producers, these firms achieved this status only recently. Thus, these firms have benefited from importation of either subassemblies or complete CMTs during the vast majority of the period of investigation. Although these firms represent a sizeable portion of domestic production during the brief time that they have been domestic producers, exclusion of these firms under the related parties provision does not adversely affect the Commission's analysis of the condition of the domestic industries for the entire period of the investigation. Thus, we have determined to exclude from the domestic industries Japanese firms that have only recently commenced domestic production in the United States.

\* \* \* \* \* \*

Available data on the condition of these domestic industries exist only at the level of complete CMTs. Thus, we have applied section 771(4)(D) and assessed the condition of these industries in terms of data on complete CMTs.

*Id.* at 9–12 (footnotes omitted).

On December 9, 1985, the ITA published its antidumping duty order encompassing CMT subassemblies as defined in the ITA's determination. 50 Fed.Reg. 51,724 (1985). During December 1985 and January 1986, the various petitioner-plaintiffs filed their individual actions challenging the ITA's final affirmative determination, its antidumping order, and the ITC's affirmative injury determination. On May 19, 1986, the Court consolidated the various actions for determination. On June 2, 1986, the Court granted Motorola's motion for defendant-intervenor status.

## DISCUSSION

Plaintiffs bring their actions pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i), and § 1516a(a)(2)(A)(i)(II), and 28 U.S.C. § 1581(c) to challenge the ITA's final affirmative antidumping duty determination (50 Fed.Reg. 45,447 (1985)), and antidumping duty order (50 Fed.Reg. 51,724 (1985)), and the ITC's final affirmative injury determination (USITC Pub. No. 1786, 50 Fed. Reg. 51,467 (Dec.1985)).

Plaintiffs' challenge to the ITA and ITC determinations can be categorized into major issues under both the ITA and ITC determinations. Concerning the ITA determination, the first category covers the issue whether or not the ITA's determination to include discrete CMT subassemblies within the scope of its investigation is supported by substantial evidence in the record and otherwise in accordance with law. The second and third categories can be characterized by the issues of whether or not the ITA's inclusions of discrete CMT subassemblies within the final affirmative LTFV antidumping duty determination and the final antidumping order, respectively, are supported by substantial evidence on the record and are otherwise in accordance with law. The fourth category covers whether or not there was substantial evidence on the record that imported discrete CMT subassemblies were sold at less than fair value, and the fifth category covers

whether or not the ITA's treatment of the issuance of purchase orders as sales for the calculation of foreign market value for Mitsubishi's merchandise was supported by substantial evidence on the record and was otherwise in accordance with law.

Concerning the challenges to the ITC determination, the first category concerns the issue of whether or not the ITC erred in its analysis of material injury to the United States CMT subassembly industries by invoking the "product lines" provision of 19 U.S.C. § 1677(4)(D) in its investigation, but failing to obtain subassembly specific data. The second category is the issue of whether or not the ITC violated the statutory requirement 19 U.S.C. § 1673 by imposing duties on imports of discrete CMT subassemblies when the ITC allegedly found only injury with respect to imports of *major* subassemblies.

■ Commerce is given broad discretion to administer the antidumping law. Upon review of an antidumping duty determination, the Court must sustain the ITA's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). The substantial evidence test restricts the scope of the Court's review of the agency record. If the ITA's interpretation is sufficiently reasonable, it will be sustained and it need not be the only reasonable interpretation. *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (1986); *Atcor, Inc. v. United States*, — CIT —, —, 658 F.Supp. 295, 299 (1987).

> Substantial evidence is recognized as:
> '[M]ore than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Substantial evidence 'is something less than the weight of the evidence and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'

*Matsushita Electric Industrial Co. v. United States*, 750 F.2d 927, 933 (1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) and quoting *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) respectively).

The imposition of antidumping duties is governed by 19 U.S.C. § 1673 *et seq.* The general scheme of the antidumping law is set forth in § 1673 in pertinent part as follows:

If—

(1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and

(2) the Commission determines that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation,

then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise. 19 U.S.C.A. § 1673 (1985).

Relevant to this action, the parties challenge both the ITA's and the ITC's determinations. The first issue raised under these challenges concerns the ITA's determination to include discrete subassemblies within the scope of its investigation initiated upon the filing of Motorola's petition.

The procedure governing the petition stage of an investigation is set forth in 19 U.S.C. § 1673a. The portions of that statute relevant to the instant action are set forth as follows:

**(b) Initiation by Petition**

(1) **Petition requirements.**—An antidumping proceeding shall be commenced

whenever an interested party ... files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations. The petition may be amended at such time, and upon such conditions, as the administering authority and the Commission may permit.

**(2) Simultaneous filing with Commission.**—The petitioner shall file a copy of the petition with the Commission on the same day as it is filed with the administering authority.

**(c) Petition determination**

Within 20 days after the date on which a petition is filed under subsection (b) of this section, the administering authority shall—

(1) determine whether the petition alleges the elements necessary for the imposition of a duty under section 1673 of this title and contains information reasonably available to the petitioner supporting the allegations.

(2) if the determination is affirmative, commence an investigation to determine whether the class or kind of merchandise described in the petition is being, or is likely to be, sold in the United States at less than its fair value, and provide for the publication of notice of the determination in the Federal Register, and

(3) if the determination is negative, dismiss the petition, terminate the proceeding, notify the petitioner in writing of the reasons for the determination, and provide for the publication of notice of the determination in the Federal Register.

19 U.S.C. § 1673a(b), (c) (1985).

Plaintiffs argue the ITA, without authority, expanded the scope of the investigation initiated by Motorola entitled "In the Matter of Cellular Mobile Telephones and Subassemblies Thereof From Japan." Specifically, plaintiffs claim the petition described only complete CMTs, CMT transceivers, and kits of major CMT subassemblies for use in final assembly of CMTs; the ITA exceeded its authority under 19 U.S.C. § 1673a(c)(2) by broadening the scope of the investigation beyond that "class or kind of merchandise described in the petition" by including the discrete subassemblies. Also challenged by plaintiffs is the determination by the ITA that the petition contained sufficient evidence of dumped sales to include the discrete CMT subassemblies.

■ Defendant, supported by Motorola, contends the petition, on its face, clearly contained the petitioner's intent to include discrete CMT subassemblies within the scope of the investigation and was supported by subsequent amendments from Motorola during the investigation. Defendant further argues the discrete CMT subassemblies are "the same class or kind" of merchandise described in the petition, and evidence submitted in the petition provides adequate evidence to include discrete CMT subassemblies in the investigation.

It is clear from the record Motorola intended to include discrete CMT subassemblies within the scope of the investigation. Although the precise language does not set forth "discrete" CMT subassemblies, the Court finds the evidence present that indicates Motorola intended discrete subassemblies to be covered in the petition as the same class or kind of merchandise to be investigated for purposes of the antidumping investigation. Accordingly, the ITA's determination was substantiated by evidence on the record and was in accordance with law.

This Court has sustained the ITA's treatment of related subassemblies as within the class or kind of merchandise described in a petition that lacked specificity as to those subassemblies when there exists no adequate information in regard to those related subassemblies to enable the preparation of the petition to be more specific. *Kokusai Electric Co. Ltd. v. United States,* —— CIT ——, ——, 632 F.Supp. 23, 27 (1986). The Court has also recognized:

> [the] distin[ction] between the authority of the Customs Service to classify according to tariff classifications (19 U.S.C.

§ 1500) and the power of the agencies administering the antidumping law to determine a class or kind of merchandise. *The determinations under the antidumping law may properly result in the creation of classes which do not correspond to classifications found in the tariff schedules or may define or modify a known classification in a manner not contemplated or desired by the Customs Service. Within the context of an antidumping proceeding the administering agency, at the proper time, can define the class in its terms.* Royal Business Machines v. United States, 1 CIT 80, 87 n. 18, 507 F.Supp. 1007, 1014 n. 18 (1980), *aff'd,* 69 CCPA 61, 669 F.2d 692 (1982) (emphasis added).

At the time of the filing of the petition, the CMT industry was very young. The petitioner's explanation of its concern for dumping was couched in the context of a quickly developing new industry where precise technical language and available knowledge to describe the industry practices and tactical maneuvering of importing was scant or unavailable. Rec.Doc. 1 at 8. The term "kits of subassemblies" reflected this lack of knowledge where it apparently was not anticipated that other forms of importation of subassemblies could be performed. The Federal Communications Commission had announced only recently in 1982 the approval of CMTs for operation. *Id.* at 1-2. The petition stated the "class or kind of merchandise" to be covered by the petition was to include "all ... subassemblies manufactured in Japan for use in final assembly of cellular mobile telephones." *Id.* at 10.

Motorola explicitly stated its concern and purpose in filing the petition was as follows:

This petition also covers cellular mobile telephone transceivers sold alone and collections of cellular mobile telephone subassemblies ("kits"). The inclusion of mobile transceivers and kits in an antidumping order is *essential to prevent the Japanese manufacturers from avoiding the impact of any final relief issued in this proceeding by simply im-porting mobile* transceivers or *kits* containing most of the necessary subassemblies or components into the United States for final assembly and testing. Wherever this Petition refers to cellular mobile telephones imported from Japan, those products should be understood to include also cellular mobile telephones made primarily using kits or mobile transceivers imported from Japan.

*Id.* at 11-12 (emphasis added). Motorola buttressed this concern by referring to the plans of Japanese manufacturers "to circumvent the law by creating the facade of manufacturing [CMTs] in the United States; when in fact that 'manufacturing' uses kits ... that are made in Japan." *Id.* at 6. Motorola also, in its petition, cited to an article describing tactical ploys the Japanese industry had used or planned to use in reaction to fear of a dumping charge by the U.S.

Further concern was expressed in the petition by reference to alleged substantial margins of dumping from 50 to 100 *per centum,* and potential lost revenues of fifty million dollars.

Motorola appeared to attempt to clarify the petition by subsequent submission to ITA during the investigation, as set forth in 19 U.S.C. § 1673a(b)(1). Although the petition appeared clear in its intent, these further submissions only reinforce the fact that discrete CMT subassemblies were within the scope of the investigation. Motorola repeatedly affirmed the ITA's determination that the scope of investigation included subassemblies defined as follows:

circuit modules and/or any other packaged functional assemblage of electronic components, dedicated for use in cellular mobile telephone transceivers or control units. Examples of such assemblies include audio processing modules, signal processing (logic) modules, RF modules, IF modules, synthesizers, duplexers, and power amplifiers.

Rec.Doc. 5 at 4. This list of items included the discrete CMT subassemblies upon which this action rests. Motorola stated explicitly: "Whether such subassemblies are packaged together or discretely for

shipment, they clearly fall within the parameters and intended scope of the petition." Rec.Doc. 46 at 6. The petition also gave notice and a clear indication to respondents the nature of petitioner's concern and the class or kind of merchandise upon which petitioner was requesting an investigation.

Also important to note is Motorola's classification explanation in its petition of those goods to be covered by the petition that could be identified in the Tariff Schedules as well as new products created beyond expectation of the tariff schedules including, "generally ... *any kits ... or subassemblies* for [CMTs], whatever the tariff classification." Rec.Doc. 1 at 13 (emphasis added).

■ Where the intent and purpose of the petitioner is clearly evinced in the petition, undergirded by a reasonably adequate description and classification of the goods to be investigated, and where recent technological advances render known and established classifications and descriptions inadequate to cover the intended merchandise of which the complaint is made, it is not unreasonable or contrary to law for the ITA to enlarge the scope of the investigation to account for these factors and to sufficiently provide coverage of merchandise intended to be covered in the petition. This is certainly no less true when the petitioner, within the statutory provisions of 19 U.S.C. § 1673a(b)(1) and upon allowance by the administering other agency, submits amendments and clarifying statements to the agency during the investigation concurring with the agency's determination.

The ITA has been vested with authority to administer the antidumping laws in accordance with the legislative intent. To this end, the ITA has a certain amount of discretion to expand the language of a peti-

tion to encompass the literal intent of the petition, not to the exclusion of other factors, but certainly, with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law. The ITA was not acting contrary to law or in a conflicting manner with substantial evidence on the record in looking to the express language and intent of the petition as expressed by petitioner. The petition sets forth the type of injury experienced by a broad definition of the merchandise suspected of causing the injury. Whether actually entered assembled, partially assembled, unassembled but together, unassembled but partially together, or totally separated, merchandise may not always be described in precise terms in a petition.[2] It is the expressed intent, supported by substantial evidence on the record which emphasizes that intent, that counts as a substantial indication of what is encompassed within the scope of the investigation. *See Diversified Products Corp. v. United States,* 6 CIT 155, 159, 572 F.Supp. 883, 887 (1983) ("[T]his court implicitly recognized that the ITA has the authority not only to define the scope of an antidumping duty investigation but also to clarify the statement of its scope....")

■ The ITA has the authority[3] to define and/or clarify what constitutes the subject merchandise to be investigated as set forth in the petition containing the intent of petitioner expressed in as specific and definite terms, descriptions, and language as reasonably expected of petitioner, taking into consideration such factors as the newness of the industry, the lack of available information due to such infancy, the shroud of secrecy a foreign industry might hang over its methods of importation, and the known tactics of foreign industries attempting to avoid a countervailing duty order. This scope of investigation

---

**2.** The Court agrees with the ITA's reasoning that: "Limitations as to packaging would simply be an invitation to evade the antidumping law through changes in packaging." *Cellular Mobile Telephones and Subassemblies From Japan; Preliminary Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 24,554, 24,555 (1985).

**3.** Inasmuch as the ITA, reiterated by defendant in its brief, claims "an inherent power to establish the parameters of the investigation," *see AD Final Determination,* 50 Fed.Reg. at 45,449, the Court stresses that such authority is bounded by the statutory guidelines established by Congress and subject to review by this Court.

may be clarified by the ITA dependent upon such additional factors as petitioner's amendments to the petition, affirmative or negative in nature, pursuant to 19 U.S.C. § 1673a(b)(1); and additional information gathered in an investigation that adds further knowledge and content to the already scant or inadequate information available on such an infant industry. This comports with Congress' intent to allow the agency some discretion in determining such circumstances on a case by case basis. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 63 (1979) U.S.Code Cong. & Admin.News 1979, pp. 381, 449 ("The committee intends the determination as to the information 'reasonably available' to a petitioner to be made in light of the circumstances of each petitioner. Information may be reasonably available to one petitioner but not to another because of differing resources or other characteristics.")

The Court notes the ITA further explained its reasoning for defining and clarifying the scope of the investigation to include CMT subassemblies and discrete subassemblies as the same "class or kind" of merchandise as complete CMTs. *See, AD Final Determination*, 50 Fed.Reg. at 45,-448.[4] This method of analysis has been approved for use by this Court in prior decisions concerning the scope of the investigation as it applies to administrative reviews. *See Diversified Products Corp. v. United States*, 6 CIT 155, 572 F.Supp. 883 (1983), *Kyowa Gas Chemical Industry Co., Ltd. v. United States*, 7 CIT 138, 582 F.Supp. 887 (1984). Upon review of the record, the Court holds the ITA's utilization and subsequent analysis, pursuant to the five factors it considered, was supported by substantial evidence on the record, was in accordance with law, and further supports the ITA determined scope of investigation of CMT and CMT subassemblies.

▪ Plaintiffs also charge that the ITA's definition of CMT subassemblies was an

---

**4.** The ITA's stated explanation is set forth below:

 I. The Department takes the position that CMT subassemblies that are 'dedicated exclusively for use' in CMTs are the same 'class or kind' of merchandise as complete CMTs. This determination is based on a consideration of the following factors: (1) General physical characteristics, (2) the expectations of the ultimate purchasers, (3) the channels of trade in which the product is sold, (4) the manner in which the product is advertised and displayed, and (5) the ultimate use of the merchandise in question. These factors have been recognized and utilized by the Court of International Trade as appropriate criteria in determining whether a new product was within the 'class or kind' of merchandise described in a prior antidumping finding, and they are likewise instructive where, as here, the question is the initial formulation of the scope of the order. See *Diversified Products Corp. v. U.S.*, 6 CIT 155, 572 F.Supp. 883 (1983), *Kyowa Gas Chemical Industry Co., Ltd. v. U.S.*, 5 ITRD 2131 (1984). Since the scope of this investigation only includes those subassemblies that are 'dedicated exclusively for use' in complete CMTs, both the ultimate use and the ultimate purchaser of the CMT subassemblies are the same as for the complete CMTs, since by definition, the CMT subassemblies could not be used in any other device. Thus, the second and the fifth criteria outlined above are met.

 Similarly, based on the evidence in the record, the Department determines that CMT subassemblies, as defined in this investigation, and complete CMTs move in the same channel of trade. Indeed, this is the very reason the Department feels it necessary to include CMT subassemblies within the scope of this investigation since otherwise any resulting order could easily be circumvented. Those subassemblies manufactured in-house by CMT producers move in the same channels of trade as the CMT of which they are a part because such subassemblies are not 'traded' except to the extent they are sold after they have been used in CMT production. While some CMT components may be purchased by CMT manufacturers from unrelated parties, the Department has reason to believe that such separately traded items may not meet the 'dedicated exclusively for use' criteria, and therefore would not be covered by the scope of any order.

 Similarly, since there is no separate channel of trade for CMT subassemblies, the only respect in which they are advertised and displayed is in the form of complete CMT units. Thus, the fourth criterion is met.

 Finally, with respect to the first criterion, the Department does not think that the fact that CMT subassemblies have, in some respect, different physical characteristics from complete CMTs should be controlling in this instance. The only difference between the two is that complete CMTs are, essentially, assembled CMT subassemblies. As a result, the Department concludes that CMT subassemblies which are dedicated exclusively for use in CMTs are within the same 'class or kind' of merchandise as complete CMTs....
50 Fed.Reg. at 45,448.

abuse of its administration of the anti-dumping law by its overreaching broadness including subassemblies that (1) individually do not account for a significant portion of the value of a complete CMT, especially at the five dollar or more value cut off level; (2) taken together with other imported subassemblies do not constitute a substantially complete CMT; and (3) are designed and intended for use in the construction of larger CMT subassemblies. Plaintiffs argue that such insignificant discrete subassemblies, when compared in value, addition, and proportionate contribution to a completed CMT, do not even attempt to be a circumvention of an antidumping order covering CMT subassemblies upon their importation into the U.S. In contradiction to the ITA and Motorola, the plaintiffs argue inclusion of the discrete CMT subassemblies is not essential to prevent evasion of an antidumping duty order.

Certain plaintiffs also complain the inclusion of discrete CMT subassemblies within the broad definition of a CMT subassembly under investigation impinges on U.S.-based Japanese firms importing discrete CMT subassemblies into the U.S. *not* for final assembly into complete CMTs *but* for further assembling with other CMT subassemblies manufactured in the U.S. to result in a complete CMT.

The ITA, in its preliminary determination, published the scope of the investigation to cover CMTs and "subassemblies dedicated for use in CMTs." *Cellular Mobile Telephones and Subassemblies From Japan; Preliminary Determination of Sales at Less Than Fair Value,* 50 Fed. Reg. at 24,554. The ITA was clear in its definition of what constituted a subassembly for purposes of the investigation:

> Subassemblies are any completed or partially completed circuit boards, circuit modules and/or any packaged assemblage of electronic components, the value of which is equal to or greater than five dollars, and which are dedicated for use in CMT transceivers or control units. Examples of such subassemblies are circuit boards and/or modules containing any of the following circuitry or combinations thereof: audio processing, signal processing (logic), RF, IF, synthesizer, duplexer, power supply, power amplification, transmitter, and exciter.

*Id.* at 24,554–55.

The ITA published a further delineated definition of what was a subassembly in its final affirmative determination and explained why such delineations had been made:

> Subassemblies are any completed or partially completed circuit modules, the value of which is equal to or greater than five dollars, and which are dedicated exclusively for use in CMT transceivers or control units. The term 'dedicated exclusively for use' only encompasses those subassemblies that are specifically designed for use in CMTs, and could not used [sic], absent alteration, in a non-CMT device. The Department selected the five dollar value for defining the scope since this is a value that it has determined is equivalent to a 'major' subassembly. The Department feels that a dollar cut-off point is a more workable standard than a subjective determination such as whether a circuit module is 'substantially complete.' Examples of subassemblies which may fall within this definition are circuit modules containing any of the following circuitry or combinations thereof: audio processing, signal processing (logic), RF, IF, synthesizer, duplexer, power supply, power amplification, transmitter, and exciter. The presumption is that CMT subassemblies are covered by the order unless an importer can prove otherwise. An importer will have to file a declaration with the Customs Service to the effect that a particular CMT subassembly is not dedicated exclusively for use in CMTs or that the dollar value is less than $5, if he wishes it to be excluded from the order.

*AD Final Determination,* 50 Fed.Reg. at 45,448 (1985).

The Court finds the ITA's decision to include the discrete subassemblies by its definition was not an abuse of its authority in protecting domestic producers against imported merchandise which was "being, or

[was] likely to be sold in the United States at less than its fair value...." 19 U.S.C. § 1673(1). The scope of the investigation was not overreaching or broad, but was reasonably designed to effectuate the administration of the antidumping law.

■ Plaintiffs argue that the five dollar or more value attached to what constitutes a major subassembly is arbitrary and that a more reasonable standard should be one where major assemblies be judged upon their use in final assembly of CMTs.

The ITA is operating under its recognized discretion in adopting what it determines to be a reasonably derived standard in what constitutes a major and a minor subassembly. The ITA stated its predominate concern was to prevent circumvention of any antidumping order on CMTs through tactical and diverse methods of importation, some of which were discussed in the ITA's final determination, and some of which were discussed in the petition. It is not hard to conceive of the diverse and sundry ways in which dumped subassembly merchandise may enter the U.S. through various channels and means and become assembled to constitute an item from which the domestic market is suffering injury. Indeed, this Court has observed in regard to an antidumping investigation of color T.V. receivers:

Ample evidence was developed during the course of the proceedings which supports the conclusion that Commerce contemplated assembly of PCBs and CPTs into CTVs within the United States.

*    *    *    *    *    *

Plaintiffs cannot avoid the imposition of antidumping duties merely by bifurcating their shipments. The Court will not allow such a transgression upon the antidumping duty laws of this country. The object of the dumping laws is to protect domestic producers against imported merchandise which 'is being, or is likely to be, sold in the United States at less than its fair value....' 19 U.S.C. § 1673(1) (1982). The present merchandise is sold on the U.S. market not as a PCB nor as a CPT, but as a color television receiver; the object of the original antidumping duty order. If the Court were to allow separate importations of PCBs and CPTs (subsequently assembled together) to escape the purview of the CTV Order, the domestic industry would continue to suffer the injurious consequences of dumped goods.

*Gold Star Co., Ltd. v. United States,* —— CIT ——, ——, 692 F.Supp. 1382, 1385, (1988) (footnote and emphasis omitted), *appeal docketed* No. 88-—— (Fed.Cir. Sept. 27, 1988).

The ITA may exercise its discretion to select a particular methodology and as long as substantial evidence on the record supports that choice, the Court reviewing such methodology will sustain the ITA's decision. This holds true when a respondent disagrees with the ITA's methodology and urges the use of an alternate method for defining the scope of an investigation. *See, Hercules, Inc. v. United States,* —— CIT ——, ——, 673 F.Supp. 454, 469 (1987). The Court also recognizes it "may not substitute its judgment for that of [the ITA] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*....'" *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 22 (1st Cir.1983), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456, 467–8 (1951)).

In the investigation, the attention of the ITA was attuned to any type of evasion of an antidumping order whether the subassemblies varied in size, type, value, or method of importation. The ITA recognized subassemblies imported in the form of kits, collections, or separates, dedicated exclusively for use in CMTs, although not constituting a "major" portion of the value or constituent part of a completed CMT, nevertheless could be quickly and easily assembled together and become a completed CMT. More importantly, the ITA determined the subassemblies and discrete subassemblies were "the class or kind of merchandise described in this petition," which

determination has been sustained by the Court. While some of the subassembly components under investigation may be proportionately less in value or size than other subassembly components, the ITA decision to include those subassemblies and discrete subassemblies in the investigation was supported by substantial evidence on the record and otherwise in accordance with law.

Concerning plaintiff's complaint the ITA's inclusion of subassembly parts interfered with foreign-owned U.S. producers' purchasing of subassemblies from abroad, defendant rightly recognizes the ITA's administration of the antidumping law is not to be concerned with effects on U.S. purchasers, but to investigate and impose duties where illegal dumping occurs. This action of imposing duties on dumped goods will necessarily affect the interests of purchasers of these goods, whether they be domestic consumers, foreign-owned production operations, or U.S. owned operations.

Concerning plaintiffs' fear of its hypothetical scenario, that the ITA's broad scope of investigation would include all subassemblies, whether sold to a supplier unrelated to the foreign producers of CMTs, or to a purchaser for use in other products; the Court finds the ITA's scope of restriction limited to "dedicated exclusively for use" in CMTs provides protection from inclusion in the order of CMT subassemblies sold to purchasers using the subassembly in non-CMT devices. *See* 50 Fed.Reg. at 45,448. The Court also notes the ITA listed other products excluded from the investigation and antidumping order. *See id.* Adequate protection was also given to those importers whose merchandise did not fall within the antidumping order by allowing those parties to file declarations to the Customs Service to be excluded from the order. Plaintiffs' hypothetical situations are just that, hypothetical, and no evidence existed to show the ITA's determination caused such exaggerated results.

Plaintiffs raise additional challenges to the ITA's determinations claiming neither the petition, nor the record contained sufficient allegations or evidence of sales of discrete CMT subassemblies at less than fair value to justify their inclusion in the ITA's investigation and order. Plaintiffs reiterate their argument that discrete CMT subassemblies were not the same class or kind of merchandise as was described in the petition and therefore information given and collected on sales of CMTs hardly substitutes for the lack of information given to and collected by the ITA on sales of discrete CMT subassemblies. Plaintiffs charge the ITA failed to investigate discrete CMT subassemblies contrary to 19 U.S.C. § 1673.

Section 1673 requires the ITA to impose duties upon foreign merchandise if the ITA determines that a class or kind of that foreign merchandise is being sold or likely to be sold in the United States at less than fair value. This is contingent, of course, upon an injury determination by the ITC. The Court has held, above, Motorola's petition did allege the elements necessary for the ITA to determine the scope of the investigation included CMTs and CMT subassemblies, both determined to be the same class or kind of merchandise to be investigated. Discrete CMT subassemblies also properly fell within this scope of investigation.

Accordingly, the petitioner did not need to provide inclusive information covering all the categories and subcategories of all those goods included as like *class* or *kind* of merchandise to be investigated. Petitioner alleged sufficient information and description for the ITA to reasonably set forth the scope of investigation. The fact that petitioner Motorola did not submit information covering every single item that was of the same kind or class of merchandise to be investigated does not, in itself, preclude the ITA from considering those goods in the scope of investigation. This fact also does not invalidate Motorola's petition from inherently including those items under the purview of the petition and investigation. Because the discrete CMT subassemblies have been found to be of the same class or kind of merchandise as CMTs, plaintiffs' argument that no substantial evidence on the record supports the inclusion of discrete CMT subassemblies in the scope

of the ITA's investigation, final determination or order, fail.

This Court has recognized, in *Royal Business Machines v. United States*, 1 CIT 80, 507 F.Supp. 1007 (1980), *aff'd*, 69 CCPA 61, 669 F.2d 692 (1982), the following:

> Each stage of the statutory proceeding maintains the scope passed on from the previous stage. Thus, the class or kind of merchandise described in the petition, which becomes the subject of investigation under 19 U.S.C. 1673a(c)(2), is the subject of the preliminary injury determination of 19 U.S.C. 1673b, the suspension of liquidation under 19 U.S.C. 1673b(d), the possible terminations or suspensions of 19 U.S.C. 1673c, and the final determinations of 19 U.S.C. 1673d.
>
> In those administrative proceedings even if plaintiff believed itself to be an 'orange' among 'apples', so long as the Department of Commerce and the ITC were considering it to belong to a certain class it remained so for the purpose of the proceedings.

1 CIT at 87, 507 F.Supp. at 1014. Accordingly, the ITA's inclusion of discrete CMT subassemblies in the scope of the investigation, determination, and order was supported by substantial evidence on the record and otherwise in accordance with law.

Plaintiff Mitsubishi raises a distinct challenge to the ITA's determination, arguing the ITA's treatment of the issuance of certain purchase orders as sales was not in accordance with law or supported by substantial evidence on the record. Mitsubishi contends the ITA erred by rejecting third country sales data as the basis for calculating foreign market value in favor of using three purchase orders issued by a Nippon Telephone and Telegraph Company (NTT) subsidiary to Mitsubishi during the investigation period. Mitsubishi argues the purchase orders did not constitute "sales" because the merchandise covered by the purchase orders was actually delivered after the close of the investigation period.

Defendant and defendant-intervenor both counter these arguments by pointing out the purchase orders were neither offers nor agreements to sell, but actual sales. The purchase orders, contends defendant and defendant-intervenor, contained the essential terms of the sale: quantity, price, and date of delivery. Subsequently, after the period of investigation, the purchase orders were filled according to the terms, contends defendant. Defendant-intervenor concludes that the consummation of the sale did not depend on the delivery time because the purchase orders themselves constituted the sale.

The ITA is directed by Congress to determine foreign market value pursuant to 19 U.S.C. § 1677b. Pursuant to the criteria set forth in § 1677b,[5] the ITA must first rely on home market sales unless, *inter*

---

**5.** Section 1677b provides in pertinent part:

(1) **In general**—The foreign market value of imported merchandise shall be the price, at the time such merchandise is first *sold* within the United States by the person for whom (or for whose account) the merchandise is imported to any other person who is not described in subsection (e)(3) of this section with respect to such person—

(A) at which such or similar merchandise is *sold or, in the absence of sales, offered for sale* in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption, or

(B) if not so *sold or offered for sale* for home consumption, or if the administering authority determines that the quantity *sold* for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which so *sold or offered for sale* for exportation to countries other than the United States,

increased by, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise *purchased or agreed to be purchased* by the person by whom or for whose account the merchandise is imported, prior to the time of importation, the foreign market value shall be ascertained as of the date of such *purchase or agreement to purchase*. In the ascertainment of foreign market value for the purposes of this subtitle no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

19 U.S.C. § 1677b (1985) (emphasis added).

*alia,* the merchandise is not sold or offered for sale for home consumption or the sales are so small as to form an inadequate basis for comparison, then the ITA should consider third-country sales.

When foreign market value is based upon sales in the home market or to third countries, it shall be the price at which the merchandise is sold, or, if no sales occur, the price at which it is offered for sale at the time such merchandise is sold to unrelated parties in the U.S.

United States price is described in 19 U.S.C. § 1677a as the following:

(a) **United States Price**—For purposes of this subtitle, the term 'United States price' means the purchase price, or the exporter's sales price, of the merchandise, whichever is appropriate.

(b) **Purchase Price**—For purposes of this section, the term 'purchase price' means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States. Appropriate adjustments for costs and expenses under subsection (d) of this section shall be made if they are not reflected in the price paid by the person by whom, or for whose account, the merchandise is imported.

(c) **Exporter's Sales Price**—For purposes of this section, the term 'exporter's sales price' means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter, as adjusted under subsections (d) and (e) of this section.

19 U.S.C. § 1677a (1985).

Although the ITA has authority to use purchase and sales agreements in determining the United States price, neither the statutes nor the regulations define the term "sale" in the context of at what time or date a sale has been consummated. 19 U.S.C. § 1677(14) does provide for the following explanation on the meaning of "sold or, in the absence of sales, offered for sale" as follows:

The term 'sold or, in the absence of sales, offered for sale' means sold or, in the absence of sales, offered—

(A) to all purchasers in commercial quantities, or

(B) in the ordinary course of trade to one or more selected purchasers in commercial quantities at a price which fairly reflects the market value of the merchandise,

without regard to restrictions as to the disposition or use of the merchandise by the purchaser except that, where such restrictions are found to affect the market value of the merchandise, adjustment shall be made therefor in calculating the price at which the merchandise is sold or offered for sale.

19 U.S.C. § 1677(14) (1985).

Although Mitsubishi argues the statutes do not give the ITA discretion to treat offers to buy as sales, it is clear the offers to buy constituted more than just an offer to buy. The Court has found that a sale can occur when an order is placed and when the basic contract terms, including price, are set. *See, Atlantic Steel Co. v. United States,* — CIT —, —, 636 F.Supp. 917, 920 (1986).

During the instant investigation the ITA sent questionnaires to Mitsubishi requesting information regarding sales in the home market. The request set out "date of sale" as that "point in the transaction where all the terms are finally determined." Rec.Doc. 71–76 at 1. The ITA has also followed this rationale in *Certain Iron Construction Castings From Brazil,* 51 Fed.Reg. 9,477, 9,481 (1986); and *64k DRAM's From Japan,* 51 Fed.Reg. 15,943, 15,946–47 (1986). In the *64K DRAM* investigation, the ITA had determined that for the merchandise involved, the purchase orders were not intended to be binding. In contrast, the instant action contains evidence that the intent of the parties to the purchase orders did intend to consummate the deal at the set terms and did in fact do so. It should also be noted that the ITA has referred to agreements to sell as a basis for foreign market value. *See, e.g.,*

*Sugar and Syrups from Canada,* 44 Fed. Reg. 64,946 (1979).

The ITA's determination that the three purchase orders constituted actual sales is supported by substantial evidence on the record. The three purchase orders had been verified by the ITA as filled orders, even absent confirmation of delivery. The terms of the orders constituted set terms of a sale: quantity, price, and date of delivery. Production orders issued by Mitsubishi demonstrated the company was fulfilling the purchase order agreement arrangements concerning the merchandise. The Court holds that the ITA's disregard of the self-serving *ex post facto* letter, by the Mitsubishi official, concerning the relationship between the company and its customer, was within the agency's discretion. The letter was offered after the close of verification. The agency was able to gather verified evidence that supported its determination.

Further, Mitsubishi failed to report these purchase orders in response to the questionnaire as related to any information concerning sales. The ITA was obliged pursuant to 19 U.S.C. § 1677e(b) to use the best information otherwise available, which was the sales information concerning the purchase orders. *See, Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556 (1984).

Accordingly, the ITA's use of the purchase orders as sales and using the date of the purchase orders as the "date of sale" was in accordance with law and was substantiated by evidence on the record.

■ Concerning the challenge to the ITC's injury determination, the Court shares some of the same concerns plaintiffs have in regard to the thoroughness of the ITC's investigation of specific information relating to a stage of production using subassemblies to produce complete CMTs. Plaintiffs argue the ITC failed to seek or request available subassembly-specific information from the domestic industries, thereby "boot-strapping" its decision to invoke a "products lines" analysis pursuant to 19 U.S.C. § 1677(4)(D), by relying on data concerning finished CMT information as the best and only information available.

Defendant counters these arguments in its brief as follows:

In this investigation, the information of record made it clear that virtually all subassemblies are manufactured by producers of CMT's [sic] and CMT transceivers and control units for captive use in their production of the finished goods.... There is no independent market for, or producer of, subassemblies. Consequently, the Commission acted reasonably in not seeking specific information relating to an intermediate stage of the production of a finished good.

Indeed, such information would of necessity represent allocations of profits to an intermediate good, or merely reflect the internal transfer pricing policies of domestic manufacturers of CMT's [sic] and CMT transceivers and control units. It would not be reasonable to assess the condition of the domestic industries on the basis of artificial or unreliable information of this nature.

Defendant's Memorandum in Response to Plaintiffs' Motions for Judgment Upon the Agency Record, Part II at 12. *Mitsubishi Electric Corp. v. United States,* Consol. Court No. 85–12–01858 (Defendant's Memo II). It appears that the ITC's questionnaire sent to the domestic CMT producers requested that replies to the domestic industry responses should: "report data separately for subassemblies ONLY IF SUCH SUBASSEMBLIES ARE SOLD TO UNRELATED PURCHASERS AS SEPARATE UNITS (i.e., if all of your firm's production of subassemblies is used internally to produce transceivers and/or control units, do not separately report data on such subassemblies)." ITC Rec. 41 (confidential), Questionnaire at 3 (emphasis in original).

Section 1673 of the antidumping law requires the imposition of duties when, *inter alia,* the ITC "determines that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of ..." LTFV imports. 19 U.S.C. § 1673 (1985). Section 1677(4)(A) defines a United

States industry as, *inter alia,* "the domestic producers as a whole of a like product...." 19 U.S.C. § 1677(4)(A) (1985). Section 1677(10) follows with the definition of a "like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation...." 19 U.S.C. § 1677(10) (1985). It was at this point that the present issue arises.

The ITC, in its injury determination, found that the CMT subassemblies under investigation are separate "like" products as compared to complete CMTs. *Cellular Mobile Telephones and Subassemblies Thereof From Japan,* USITC Pub. No. 1786 at 6–7 (1985). The ITC, also in the determination, stated the following: "Available data on the condition of these domestic industries exist only at the level of complete CMTs. Thus, we have applied [§ 1677(4)(D)] and assessed the condition of these industries in terms of data on complete CMTs." *Id.* at 11–12.

Section 1677(4)(D) provides:

> **(D) Product lines.**—The effect of subsidized or dumped imports shall be assessed in relation to the United States production of a like product *if available data permit* the separate identification of production in terms of *such criteria as* the *production process* or the producer's profits. If the domestic production of the like product has no separate identity in terms of such criteria, then the effect of the subsidized or dumped imports shall be assessed by the examination of the production of the narrowest group or range of products, which includes a like product, for which the necessary information can be provided.

19 U.S.C. § 1677(4)(D) (1985) (emphasis added).

Defendant claims the ITC applied the second half of § 1677(4)(D), called the "product lines" proviso, because there was a "lack of specific information relating to production of [the] subassemblies." Defendant's Memo II at 10–11. The ITC's utilization of the "product line" proviso, defendant argues, gave the ITC authority to analyze "the condition of [the domestic subassembly] industries using the best information available, [which was] data concerning complete CMT's [sic] and CMT transceivers and control units...." *Id.*

The Court recognizes that § 1677(4)(D) gives the ITC authority to invoke the "product lines" proviso only if the ITC adheres to the first portion of § 1677(4)(D). The ITC *shall* assess the effect of dumped imports on the U.S. production of like products *if available* data permits the *separate* identification of *production* in terms of such criteria as *production process* or producer's profits. *Id.*

In the present case, the ITC precluded itself from receiving *available* data permitting separate identification of production of subassemblies. The ITC chose not to seek this information from the domestic industry as it concerned subassemblies sold to related purchasers. As defendant explains, the ITC *assumed* such information, no matter how available, was irrelevant and unreliable and should not have merited an attempt to obtain and consider. Defendant's Memo II at 12. When challenged on the thoroughness of the investigation, defendant replied "it appears that there is no *standard* of investigative thoroughness which the [ITC] must meet in any investigation beyond the standards for review of [ITC] determinations...." *Id.* at 14–15. Using this rationale, it could be argued that the ITC is free to request only that information which will bolster its assumed conclusions and preclude any other available information whether contrary or not. Thus, in these circumstances, the ITC would be able to shape the record with only that information which would certainly constitute substantial evidence on the record. Such actions would certainly be found to be arbitrary and contrary to law.

The Court also recognizes that using the best information available rests on the presumption that reasonably available information will be sought, collected, and considered before determining what is the best available information to use. Here, the ITC has defined what is the best information available before requesting available information, and then has couched its lan-

guage in the questionnaire to request only that predetermined data. Such examples of predestination are not for the ITC to establish and control.

The lack of availability of information concerning subassembly production was never addressed by defendant, except to the extent that such information, whether available or not, was not worthy of consideration on the premise that CMT data was more trustworthy. The Court observes that better effort must be undertaken to request available information that is, on its face, relevant to separately identifying production.

The Court is not in a position to determine what information is available to permit separate identification of production, but to review those type of decisions left to the discretion of the ITC. However, where the ITC actively precludes itself from receiving relevant data or takes no effort to seek relevant data contrary to § 1677(4)(D), which directs the ITC *shall* assess domestic production where available data exists and where that data is reasonably available for the ITC to collect and consider, then such actions will be found to be contrary to law. *See Babcock & Wilcox Co. v. United States*, 2 CIT 74, 521 F.Supp. 479 (1981), *vacated*, 4 CIT 3 (1982).[6]

This Court has also had opportunity to expound on the ITC's responsibility of investigation under § 1677(4)(D). The court, in *Kenda Rubber Indus. Co., Ltd. v. United States*, —— CIT ——, 630 F.Supp. 354 (1986) observed:

> This Court had occasion to examine this passage of the Senate Report in *Roquette Freres v. United States*, 7 CIT 88, 583 F.Supp. 599 (1984). After quoting this passage the Court stated, 'It is incumbent on the ITC to acquire all obtainable or accessible information from the

affected industries on the economic factors *necessary for its analysis*.' 583 F.Supp. at 604 (emphasis added). Congress did not intend to require the Commission to obtain separate data on every enumerated economic factor; rather, it directed the Commission to obtain such data, where possible, as allows it to make a 'reasonably separate consideration.'

*Kenda Rubber*, —— CIT at ——, 630 F.Supp., at 357–58.

The Court recognizes had the ITC requested and considered this reasonably available data and then, under its statutory discretion, found such information irrelevant or unreliable, then evidence on the record would exist in order for the Court to properly review the determination. The best information available could have also been considered by the ITC had the responding parties been uncooperative or unable to produce requested information. *See* 19 U.S.C. § 1677e(b). But here, the information, while reasonably available, was not requested.

Accordingly, the Court holds the ITC's failure to seek reasonably available data concerning subassembly production (*i.e.*, available data permitting the separate identification of production) was contrary to law and did establish a lack of thoroughness in its investigative duties where § 1677(4)(D) is concerned.

## CONCLUSION

For the reasons stated above, the Court holds it was contrary to law for the ITC to fail to request and examine data reasonably available concerning domestic production of subassemblies pursuant to the "product lines" proviso of 19 U.S.C. § 1677(4)(D), and remands this case to the ITC for further proceedings in accordance

---

**6.** In considering the ITC's disregard of submitted data, which the ITC itself considered self-serving, it has been observed by this Court:

> the self-serving nature of the data should not be defeating, given the Commission's investigatory function to verify data received. Congress anticipated that petitioners in antidumping proceedings would have a stake or interest in developing the relevant facts supporting a dumping finding. Not only should the Com-

mission have considered plaintiff's profit data in connection with its determination as to the scope of the 'industry', it should have sought such data from the other domestic producers comprising the boiler tube and pipe industry before moving to the broader industry which even the Commission's own staff acknowledges to have been a mistake.

*Babcock & Wilcox*, 2 CIT at 80, 521 F.Supp. at 485.

with this opinion. The Court upholds the ITA's inclusion of discrete CMT subassemblies within the scope of its investigation, the final affirmative LTFV antidumping duty order and the final antidumping order. Additionally, the Court holds the ITA's treatment of purchase orders as sales for the calculation of foreign market value for Mitsubishi's merchandise and the ITA's determination that imported discrete CMT subassemblies were sold at less than fair value, are supported by substantial evidence on the record and otherwise in accordance with law.

### ORDER

Upon plaintiffs' motion for review of the final affirmative injury determination by the United States International Trade Commission (ITC) in *Cellular Mobile Telephones and Subassemblies Thereof From Japan,* USITC Pub. No. 1786, 50 Fed.Reg. 51,467 (1985), it is hereby

ORDERED that the determination is remanded to the ITC; and

(1) The ITC is directed to request, gather, examine, and consider subassembly-specific information and data that is available to permit the separate identification of production in terms of such criteria as the *production process* or the producer's profits pursuant to 19 U.S.C. § 1677(4)(D); and

(2) Take such other administrative action the ITC deems appropriate not inconsistent with the opinion issued simultaneously herewith; and

(3) Report the results of such remand determination to this Court within 45 days from the date hereof.

So Ordered.