**Slip Op. 05-13**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE RICHARD W. GOLDBERG, SENIOR JUDGE**

| | |
|---|---|
| NITROGEN SOLUTIONS FAIR TRADE COMMITTEE,<br><br>      Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>          and<br><br>JSC NEVINNOMYSSKIJ AZOT INC., TRANSAMMONIA, INC. AND J.R. SIMPLOT COMPANY,<br><br>      Defendant-<br>      Intervenors. | **PUBLIC VERSION**<br><br>Court No. 03-00260 |

[ITC's final negative injury and threat determination sustained.]

Date: January 31, 2005

Akin, Gump, Strauss, Hauer & Feld, LLP (Valerie A. Slater and Margaret Chisholm Marsh) for Plaintiff Nitrogen Solutions Fair Trade Committee.

James Lyons, Acting General Counsel, U.S. International Trade Commission (Michael Kenneth Haldenstein) for Defendant United States.

White & Case, LLP (Walter J. Spak, Frank H. Morgan, and Lyle B. Vander Schaaf) for Defendant-Intervenors JSC Nevinnomysskij Azot Inc. and Transammonia, Inc.

Miller & Chevalier Chartered (Peter J. Koenig) for Defendant-Intervenor J.R. Simplot Company.

**OPINION**

**GOLDBERG, Senior Judge:** In this action, Plaintiff Nitrogen Solutions Fair Trade Committee challenges the final negative injury and threat determination of the United States International Trade Commission ("ITC") in the antidumping proceedings involving Urea Ammonium Nitrate Solutions from Belarus, Russia and Ukraine, 68 Fed. Reg. 18673 (Apr. 16, 2003) ("Notice of Determination") and USITC Pub. 3591, Inv. Nos. 731-TA-1006, 1008, and 1009 (Apr. 2003) ("Views of the Commission") (together, the "Final Determination"). Pursuant to USCIT Rule 56.2, Plaintiff moves for judgment on the agency record.

For the reasons that follow, the Court sustains the Final Determination.

## I.   BACKGROUND

Plaintiff is an association of domestic producers of urea ammonium nitrate ("UAN"). Notice of Determination at 18674. UAN is a liquid nitrogen fertilizer used primarily in the United States ("U.S.") for row crops. Views of the Commission at 5. It is a commodity product; UAN from different sources (including imports) is commingled throughout the distribution system. Id. at 14. Natural gas is an important material input used to produce UAN,

accounting for over half of its cost of production.  Id.
In late 2000 and early 2001, natural gas prices in the U.S.
increased dramatically.  Id.  During this same period,
domestic UAN prices rose, domestic UAN consumption fell and
the volume of UAN imports to the U.S. increased.  Id. at
13-16.  In addition, the domestic UAN industry lost market
share and suffered financially.  Id. at 25.  Natural gas
prices began to normalize in mid 2001.  Id. at 18.  Imports
also began to decline, although remained at historically
high levels.  Id.

On April 19, 2002, Plaintiff filed petitions with the
U.S. Department of Commerce and the ITC alleging that UAN
from Belarus, Lithuania, Russia and Ukraine was being sold
in the U.S. at less than fair value and was causing
material injury or threatening to cause material injury to
the domestic UAN industry.  The ITC initiated an
antidumping investigation on that same day.  67 Fed. Reg.
20994 (Apr. 29, 2002).  On June 4, 2002, the ITC issued a
unanimous affirmative preliminary injury and threat
determination as to UAN imports from Belarus, Russia and
Ukraine (the "subject imports"), and determined that
imports from Lithuania were negligible.  Urea Ammonium
Nitrate Solutions from Belaus, Russia, and Ukraine, 67 Fed.
Reg. 39439 (June 7, 2002) and USITC Pub. 3517, Inv. Nos.

731-TA-1006, 1008, and 1009 (June 2002) ("Preliminary Views of the Commission") (together, the "Preliminary Determination").

The ITC then commenced its final investigation.  On April 10, 2003, the ITC issued the Final Determination, unanimously concluding that the domestic UAN industry was not materially injured or threatened with material injury by reason of the subject imports.  Views of the Commission at 34.

This appeal followed.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(c).

## II.  STANDARD OF REVIEW

The Court must sustain the Final Determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" taking into account the record as a whole.  Pierce v. Underwood, 487 U.S. 552, 565 (1988) (citation omitted).  It "requires more than a mere scintilla, but is satisfied by something less than the weight of the evidence."  Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (citations omitted).

In conducting its review, the Court must consider "not

only the evidence on the record that justifies the ITC's findings, but also whatever in the record fairly detracts from its weight." Am. Bearing Mfrs. Ass'n v. United States, 28 CIT ___, ___ (2004) (citations omitted). However, the Court "may not reweigh the evidence or substitute its judgment for that of the ITC." Dastech Int'l, Inc. v. USITC, 21 CIT 469, 470, 963 F. Supp. 1220, 1222 (1997). Instead, the Court's function is to ascertain "whether there was evidence which could reasonably lead to the [ITC]'s conclusion[.]" Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Id. (citation omitted).

### III. DISCUSSION

**A.    The ITC's Determination that Subject Imports Did Not Undersell Domestic UAN Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

In making its final injury and threat determination, the ITC was required to consider the effect of subject imports on domestic UAN prices. 19 U.S.C. § 1677(7)(B)(i)(II). As part of this evaluation, the ITC was further required to consider whether there had been "significant price underselling" by subject imports

compared with the price of domestic UAN during the period of investigation.  Id. § 1677(7)(C)(ii)(I).  In the Final Determination, the ITC found that prices of imported UAN were generally higher than domestic UAN from 1999 to 2001 and for the interim periods of January-September 2001 and January-September 2002 (together, the "period of investigation").  Views of the Commission at 20.  Relying in part on this underselling analysis, the ITC ultimately concluded that there was no evidence of significant price effects by reason of the subject imports.  Id. at 21.

Plaintiff advances four arguments for why the ITC's underselling analysis is not supported by substantial record evidence or otherwise in accordance with law.  For the reasons set forth below, the Court sustains this aspect of the Final Determination.

### 1.   The ITC Appropriately Excluded Sales Data That Did Not Involve Comparable Quantities of UAN.

Plaintiff argues that the ITC erred by excluding from consideration in its underselling analysis certain sales data from a significant importer into three of the U.S. cities under investigation ([

]).  See Plaintiff's Memorandum In Support of Its Rule 56.2 Motion for Judgment on the Agency Record ("Pl.'s Br.") at 17.  In the Final Determination, the ITC declined

to consider this importer's sales made by [           ] because sales using this form of transport "[did] not involve comparable quantities" and "were generally much larger than the sales of domestic UAN."  Views of the Commission at 21 n.101.  Plaintiff contends that the ITC should not have excluded these sales because: (1) except for one significant importer, none of the sales data gathered during the investigation distinguished sales based on transportation modes or shipment quantities, rendering impossible any comparisons on these bases among non-excluded sales and (2) most producers (including the significant importer in question) did not report volume discounts, indicating that prices for large and small quantity sales were comparable.[1]  Pl.'s Br. at 17-20. According to Plaintiff, this erroneous exclusion resulted in a flawed set of sales data that skewed the ITC's underselling analysis.  Id. at 20.

The Court finds that the ITC appropriately excluded from its underselling analysis sales made by [           ] because they did not involve comparable quantities of UAN. First, the Court finds that the ITC had a sufficient data

---

[1] Plaintiff also argues at length that the [           ] sales should not have been excluded because they were made at the same distribution level as domestic UAN sales.  Pl.'s Br. at 18.  However, in the Final Determination, the ITC never concluded that these sales did not compete with domestic UAN or were at a different level of trade.  Plaintiff's arguments concerning this point are, therefore, irrelevant.

set from which it could reasonably make a distinction between the excluded sales and other reported sales.  Using its final questionnaire, the ITC collected monthly sales data for certain U.S. cities from domestic UAN producers and UAN importers over the period of investigation.  See Plaintiff's Appendix to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("Pl.'s App."), App. 12 (Form of Final Questionnaire) at 13.  It was not necessary for the final questionnaire to request per-sale information on the mode of transport because, contrary to Plaintiff's contention, the ITC did not exclude sales on the basis of their mode of transport.  The Final Determination clearly indicates that the sales in question were excluded solely because of their incomparable quantities.  See Views of the Commission at 21 n.101.  Although these large quantities were possible only "because of the way in which the product [was] sold," this does not equate to a distinction based on mode of transport.  Id. at 21.  In addition, the Court finds that it was not necessary for the final questionnaire to require per-sale quantity information for all UAN producers.  The per-sale quantity of the excluded sales was so large that, even if it were assumed that the monthly sales volume reported by each domestic producer represented a single sale, the sales in question nonetheless

represented significantly higher quantities in nearly every month of comparison. See Defendant's Appendix to Defendant's Response in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("Def.'s App."), List 2, Doc. 108 (ITC Staff Report for INV-AA-031 dated Mar. 11, 2003) at E-1a-E-2c. As such, the Court finds that the ITC collected sufficient data upon which to base its decision to exclude the sales contested by Plaintiff.

Second, the Court finds that the ITC appropriately used its discretion when declining to compare sales involving significantly different quantities. The ITC, "as the trier of fact, has considerable discretion in weighing the probative value and relevance of evidence." Hyundai Electronics Indus. v. United States, 21 CIT 481, 485 (1997). "The [ITC] weighs the evidence as the trier of fact in these cases, and has authority to reject or discount data that it determines is unreliable." Mitsubishi Materials v. United States, 20 CIT 328, 332, 918 F. Supp. 422, 426 (1996). The ITC's decision to place less weight on sales price comparisons involving different quantities has been upheld previously by this Court. See Floral Trade Council v. United States, 20 CIT 595 (1996). In Floral Trade, the ITC's stated reason for according less weight to incomparable sale quantities was a concern that

different quantities may have affected relative prices.

Id. at 603.  The Floral Trade court found this explanation

to be reasonable.  Id.  The instant case presents similar

concerns.  The significant importer's excluded sales were

so large as to be of a fundamentally different order of

magnitude than sales by domestic producers.  See Def.'s

App., List 2, Doc. 108 (ITC Staff Report for INV-AA-031

dated Mar. 11, 2003) at E-1a-E-2c.  Sales of large volumes

may affect product prices, limiting the value of price

comparisons.[2]  Although Plaintiff contends that relative

prices were not affected in this case because this

significant importer reported that it did not offer

discounts, Pl.'s Br. at 18, this argument is unconvincing.

The significant importer did not have to identify a

discount because, as noted by Plaintiff, the majority of

its 2001 sales were at the lower price offered for [

] sales.  Id. at 17.  This lower price is the importer's

predominant selling price and therefore need not result

from a discount per se.

---

[2] The ITC has previously found that different sales quantities can limit the value of price comparisons.  See Spring Table Grapes from Chile and Mexico, 731-TA-926 and 927 (Preliminary) (June 2001), USITC Pub. 3432 at 16 n.101 (limited utility of price comparisons due to smaller quantities of subject imports); Bicycles From China, 731-TA-731 (Final) (June 1996), USITC Pub. 2968 at 14 n.103-04 (Chairman Watson and Commissioner Crawford) (comparisons entitled to less weight due to difference in quantities sold); Fresh Cut Roses from Colombia and Ecuador, 731-TA-684 and 685 (Final) (Mar. 1995), USITC Pub. 2862 at I-22 (usefulness of comparison limited by different quantities).

Accordingly, the ITC's exclusion of the [        ] sales of a significant importer was reasonable and the resulting sales data set provides substantial evidentiary support for the ITC's underselling analysis.

   **2.    *The ITC Reasonably Relied on Sales Data and Representations Submitted by a Significant Importer During the Final Investigation.***

Plaintiff contends that the ITC erred by relying on the sales data and representations of a significant importer during the final investigation, resulting in a flawed set of sales data that skewed the ITC's conclusions. Pl.'s Br. at 20.  Plaintiff asserts that this significant importer failed to include sales data for New Orleans in its responses to the final investigation questionnaire. Id.  In support of this contention, Plaintiff points to this importer's preliminary investigation questionnaire responses, which included data on a significant amount of New Orleans sales.  Id. at 21-22.  Plaintiff contends that this significant importer misrepresented its New Orleans sales to the ITC by claiming that sales reported in the preliminary investigation did not meet the revised pricing parameters of the final investigation questionnaire.  Id. The final investigation questionnaire required this importer to report only those sales made on a [
     ] basis to the receiving points of U.S. customers in

certain U.S. cities and their proximate locations.  See

Def.'s App., List 2, Doc. 207 (Importer's Questionnaire

Responses of [                    ] dated Dec. 13, 2002) at

8.  Plaintiff argues that the ITC ignored substantial

record evidence indicating that the New Orleans sales data

produced by the significant importer during the preliminary

investigation was in fact responsive to the final

questionnaire.  Pl.'s Br. at 21.  Specifically, Plaintiff

notes that this importer's questionnaire responses

indicated that (1) [  ] percent of its product was

delivered within [    ] miles of its initial shipping

location and [  ] percent of its product was delivered to [

]; (2) the importer could not comment on [

                                                       ];

and (3) the importer typically quoted selling prices on a [

] basis for product delivered [          ] and on a [    ]

basis for product delivered [                    ].  See

Def.'s App., List 2, Doc. 207 (Importer's Questionnaire

Responses of [                    ] dated Dec. 13, 2002) at

8, 18-19.  Plaintiff argues that the ITC's reliance on

obviously incomplete sales data for New Orleans skewed the

ITC's underselling analysis, rendering it unsupported by

substantial evidence.  Pl.'s Br. at 23.

     The Court finds that the ITC reasonably relied on the

sales data and representations submitted by the significant

importer in question during the final investigation.

First, the ITC appropriately used its discretion to assess

the credibility and reliability of the information it

received during the investigation.  See Chefline Corp. v.

United States, 25 CIT 1129, 1136, 170 F. Supp. 2d 1320,

1330 (2001) ("[I]t is within the [ITC]'s discretion to make

reasonable interpretations of the evidence and to determine

the overall significance of any particular factor or piece

of evidence.") (citation omitted).  The ITC is under no

legal obligation to perform an onsite verification or audit

of final questionnaire responses in an antidumping

investigation.  See Titanium Metals Corp. v. United States,

25 CIT 648, 663, 155 F. Supp. 2d 750, 765 (2001) (noting

that "Congress has not required the [ITC] to conduct

verification procedures for the evidence before it, or

provided a minimum standard by which to measure the

thoroughness of [an ITC] investigation") (citation

omitted); see also Mitsubishi Elec. Corp. v. United States,

12 CIT 1025, 1058, 700 F. Supp. 538, 564 (1988) (ITC has

discretion in verifying data received but may not actively

preclude itself from receiving relevant or contrary data).

Here, the importer in question submitted the required

certification as to the accuracy and completeness of its

final questionnaire responses.  See Pl.'s App., App. 15 (Importer's Questionnaire Responses of [                    ] dated Dec. 18, 2002) at 1.  Choosing not to rely solely on this certification, the ITC took additional steps to ensure that the data was reliable.  The ITC conducted multiple telephone conversations with this importer between December 2002 and March 2003 in order to make certain that this importer first understood the revised pricing parameters of the final questionnaire and then had provided data for all responsive sales.  See Def.'s App., List 2, Doc 112 (ITC Staff Handwritten Notes from Dec. 2002-Mar. 2003) at 17, 26; id., List 2, Doc 209 (Letter Accompanying Revised Importer's Questionnaire of [                    ] dated Mar. 4, 2003) at 2.  The ITC was told by the importer and its counsel that they understood the parameters of the final questionnaire and that sales out of New Orleans were not made in a manner that met these parameters.  It was within the ITC's discretion to rely on questionnaire responses verified in this way.

Second, the Court's review of the record evidence supports the ITC's conclusion that this importer's New Orleans sales did not meet the final questionnaire pricing parameters.  This significant importer's questionnaire responses indicated that [  ] percent of its product was

delivered to [                                        ] and that

sales of this nature were quoted on a [          ] basis –

not [    ] as required by the final questionnaire pricing

parameters.  See Def.'s App., List 2, Doc. 207 (Importer's

Questionnaire Responses of [                        ] dated Dec.

13, 2002) at 8, 18-19.  Given that a very high percentage

of this importer's total sales did not meet the final

questionnaire's pricing parameters, it is not surprising

that this importer did not report sales for one of the five

U.S. cities under investigation.  Indeed, the Court notes

that a member of Plaintiff's trade committee, [

                          ], also did not report sales

data for New Orleans or any other city due to the revised

pricing parameters of the final questionnaire.  See id.,

List 2, Doc. 108 (Final Staff Report dated Mar. 11, 2003)

at V-22.  Further, given the proximity of New Orleans to

the Mississippi river system, it is also not surprising

that New Orleans sales were received by customers at points

further inland, resulting in delivery terms which were non-

responsive to the final questionnaire's pricing parameters.

In addition, none of this importer's [

      ] were proximate to New Orleans.  See id., List 2,

Doc. 76 (Importer's Questionnaire Responses of [

] dated May 6, 2002) at 31.  Although this evidence is not

necessarily reflective of the actual receiving points of this importer's New Orleans sales, Plaintiff is unable to point to any direct contradicting evidence other than its own interpretation of the importer's questionnaire responses.  In light of the entire record, the Court finds that Plaintiff's alternative reading is insufficient to upset the substantial evidence standard.

Third, Plaintiff's interpretation of the questionnaire responses seems implausible.  Under Plaintiff's reading of the questionnaire responses, [   ] percent of the importer's sales occurred within 100 miles of its shipping locations and [   ] percent of its sales occurred over 500 miles from its shipping locations.  These percentages total more than 100 percent – a result unexplained by Plaintiff. Plaintiff's reading of this importer's questionnaire responses does indicate that there were certain ambiguities in these responses, leading to the possibility of alternative inferences.  However, even if the Court were inclined to agree with Plaintiff's strained interpretation, the Court's standard of review prevents it from reevaluating the evidence.  See Koyo Seiko Co. v. United States, 24 CIT 364, 366, 110 F. Supp. 2d 934, 936 (2000) ("It is not within the court's domain . . . to reject a finding on grounds of a differing interpretation of the

record.") (citations omitted).

Accordingly, the ITC's reliance on this significant importer's questionnaire responses was reasonable and the resulting New Orleans sales data set provides substantial evidentiary support for the ITC's underselling analysis.

### 3. The ITC Appropriately Accepted Sales Data and Pricing Arguments Submitted by a Significant Importer in an Ex Parte Communication with the ITC Fourteen Days Before the Record Closed.

Plaintiff contends that the ITC erred by considering, for purposes of its underselling analysis, certain sales data and pricing arguments submitted by a significant importer on March 3, 2003, fourteen days before the record closed.  Pl.'s Br. at 24.  Plaintiff argues that the ITC's consideration of this information was not in accordance with law because: (1) the information was submitted more than five months after comments were due on the questionnaire used by the ITC to collect sales and pricing data; (2) the information was communicated in verbal form during an ex parte communication, which violated the ITC's requirement that such comments be submitted in written form and served on all parties; and (3) the ITC delayed releasing the pricing arguments until March 11, 2003, six days before the record closed.  Id. at 24-28.  Plaintiff contends that it was prejudiced by the ITC's improper

consideration of this data because it was not allowed sufficient time to defend its interests.  Id. at 29.

The Court finds that the ITC appropriately accepted sales data and pricing arguments submitted by a significant importer in an ex parte communication on March 3, 2003. First, Plaintiff mischaracterizes the nature of the sales data and pricing arguments made by the importer in question.  The Court finds that this information was not a belated attack on the final questionnaire format or means of data collection as alleged by Plaintiff; rather, the record indicates that the sales data and pricing arguments were submitted in response to questions posed by the ITC as part of an ongoing dialogue concerning the antidumping investigation.  See Def.'s App., List 2, Doc. 112 (ITC Staff Handwritten Notes from Dec. 2002-Mar. 2003); id., List 2, Doc. 68 (ITC Staff Handwritten Notes from Apr.-May 2002).  Neither the antidumping statute nor the ITC's rules governing this investigation set an earlier deadline by which such responses should have been submitted.

Second, ex parte communications are a necessary part of an antidumping investigation and are expressly sanctioned by law.  See 19 U.S.C. § 1677f(a)(3) (prescribing rules for ex parte meetings held by ITC); United States v. Roses, Inc., 706 F.2d 1563, 1567 (Fed.

Cir. 1983) ("Dumping investigations do not include and never have included due process adversary hearings, but always have included ex parte meetings separately with the contenders."). The antidumping statute and regulations require information to be submitted in written form and served on all parties only in certain contexts. See, e.g., 19 C.F.R. § 207.20(b) (requiring comments on draft final questionnaire to be submitted in writing). Because the Court finds that the arguments made by this importer on March 3, 2003 were not a disguised commentary on the final questionnaire, there is no statutory basis for requiring that these arguments be submitted in writing.

Finally, even if the ITC had violated its own procedures by accepting the March 3, 2003 sales data and pricing arguments or releasing the sales arguments eight days later, Plaintiff has failed to show that it was prejudiced by such actions. A claim of a procedural violation by an agency is actionable only upon a showing of prejudice to a party which is curable on remand. Allegheny Ludlum v. United States, 24 CIT 858, 873, 116 F. Supp. 2d 1276, 1291 (2000), vacated and remanded on other grounds, 287 F.3d 1276 (Fed. Cir. 2002). Plaintiff was served with the March 3, 2003 sales data on that same day. See Def.'s App., List 2, Doc. 222 (Certificate of Service dated Mar.

3, 2003).  Plaintiff was provided with the March 3, 2003 pricing arguments eight days later – in time for Plaintiff to submit two filings with the ITC specifically commenting on the March 3, 2003 sales data and pricing arguments.  See id., List 2, Doc. 107 (Plaintiff's Memo Providing Additional Information Requested by the ITC dated Mar. 14, 2003); id., List 2, Doc. 118 (Plaintiff's Final Comments dated Mar. 19, 2003).  Although these filings were page and content-limited under ITC regulations, the points raised by Plaintiff in these two filings are nearly identical to those made before the Court.  As such, the Court finds that Plaintiff was afforded an adequate opportunity to present its views to the ITC concerning the March 3, 2003 sales data and pricing arguments before the administrative record closed.

Accordingly, the ITC's decision to accept the March 3, 2003 sales data and pricing arguments of a significant importer is in accordance with law.

**4.    *The ITC Adequately Addressed Plaintiff's Arguments Concerning the ITC's Underselling Analysis.***

Plaintiff argues that the ITC erred because the Final Determination did not address certain of Plaintiff's arguments concerning the ITC's underselling analysis. Pl.'s Br. at 29.  Under the antidumping statute, the ITC is

required to include in its final injury determination "an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties . . . concerning volume, price effects, and impact on the industry." 19 U.S.C. § 1677f(i)(3)(B). Plaintiff contends that the ITC did not consider: (1) Plaintiff's anecdotal evidence of underselling and lost revenues/sales and (2) Plaintiff's arguments concerning the price ramifications of mixed over- and underselling by high volume imports in a commodity market.[3] Pl.'s Br. at 29-31.

The Court finds that the ITC adequately addressed Plaintiff's arguments concerning the ITC's underselling analysis. First, the ITC plainly referenced anecdotal evidence of underselling in the Final Determination. See Views of the Commission at 23 ("We also note that none of the petitioners' lost sales or lost revenue allegations was confirmed."). During the investigation, Plaintiff made 45 specific allegations of lost sales and lost revenues – none of which could be confirmed by the ITC. See Def.'s App., List 2, Doc. 108 (ITC Staff Report for INV-AA-031 dated Mar. 11, 2003) at V-66. Although Plaintiff submitted

_____

[3] Plaintiff also argues that the ITC failed to address its concerns about the sales data used to develop the underselling analysis. Pl.'s Br. at 30. Since the Court finds that the ITC used an adequate sales data set, as discussed infra at III.A.1-2, this argument is not addressed.

anecdotal evidence of underselling later in the investigation, the ITC "has broad discretion in analyzing and assessing the significance of evidence on price undercutting."  Nucor Corp. v. United States, 28 CIT ___, ___, 318 F. Supp. 2d 1207, 1256 (2004) (citing Copperweld Corp. v. United States, 12 CIT 148, 161, 682 F. Supp. 552, 565 (1988) (citing S. REP. No. 96-249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. at 474).  The ITC reasonably chose to rely on the evidence developed by its staff, rather than Plaintiff, and the Court will not disturb this decision.  Further, the Court notes that, at best, Plaintiff's anecdotal evidence simply indicates that some underselling occurred during the period of investigation – a fact that was clearly acknowledged in the Final Determination.  See Views of the Commission at 20 (". . . and [      ] short tons was undersold.").

Second, the ITC also plainly referenced Plaintiff's mixed over- and underselling theory in the Final Determination.  See id. at 20 ("Petitioners argue that the picture of underselling/overselling would be more 'mixed' . . .").  The ITC explained that it chose not to adopt Plaintiff's theory because it would have required the ITC to consider sales data that, for the reasons discussed infra at III.A.1-2, the ITC reasonably excluded from its

data set.  Further, the Court notes that, even though the ITC has in the past applied the mixed over- and underselling theory suggested by Plaintiff, it is not required to do so in every investigation.  See Nucor, 28 CIT at ___, 318 F. Supp. 2d at 1247 ("It is a well-established proposition that the ITC's material injury determinations are sui generis; that is, the agency's findings and determinations are necessarily confined to a specific period of investigation with its attendant, peculiar set of circumstances.") (citations omitted).

Accordingly, the ITC's consideration and treatment of Plaintiff's arguments concerning the ITC's underselling analysis is in accordance with law.

B.    **The ITC's Determination that Subject Imports Did Not Depress or Suppress Domestic UAN Prices Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

As part of its required evaluation of the effect of subject imports on domestic UAN prices, the ITC was obligated to consider whether subject imports had significantly depressed or suppressed domestic UAN prices. 19 U.S.C. § 1677(7)(C)(ii)(II).  In the Final Determination, the ITC found that prices for domestic UAN rose in tandem with natural gas prices, suggesting that domestic prices were not depressed by subject imports.

Views of the Commission at 21.  Further, the ITC found that the net sales unit values of domestic producers increased more than their unit cost of goods sold ("COGS") during most of the period of investigation, indicating that domestic prices were not suppressed by subject imports relative to costs.  Id. at 22-23.  The ITC concluded that subject imports had not depressed or suppressed domestic UAN prices to any significant degree during the period of investigation.  Id. at 23.  Relying in part on this negative price depression/suppression analysis, the ITC ultimately concluded that there was no evidence of significant price effects by reason of the subject imports. Id. at 21.

Plaintiff advances one major argument for why the ITC's price depression/suppression analysis is not supported by substantial record evidence or otherwise in accordance with law.[4]  For the reasons set forth below, the Court sustains this aspect of the Final Determination.

Plaintiff contends that the ITC erred by using full-

---

[4] Plaintiff also presents two additional arguments countering the ITC's price depression/suppression analysis.  First, Plaintiff argues that the ITC's sales data set was flawed, leading to an incorrect price depression/suppression analysis.  Pl.'s Br. at 23.  Since the Court finds that the ITC used an adequate sales data set, as discussed infra at III.A.1-2, this argument is not addressed.  Second, Plaintiff contends that the ITC improperly weighed anecdotal evidence of lost sales and lost revenues, which further skewed the price depression/suppression.  Id. at 24.  Since the Court finds that the ITC properly weighed this evidence, as discussed infra at III.A.4, this argument is not addressed.

year data to examine the correlation between domestic UAN prices and natural gas prices. Pl.'s Br. at 23-24. Plaintiff argues that if the ITC had analyzed half-year data instead of full-year data, it would have found that, in the second half of 2001, the domestic industry's COGS was higher than domestic UAN prices and the domestic UAN industry suffered one of its worst financial performances of the entire period of investigation. Id. at 38-40. This time period corresponded with the highest levels of subject imports during the period of investigation, despite falling natural gas prices. Id. Plaintiff argues that these facts, revealed only by using half-year data, help establish that the peak volume of subject imports in the second half of 2001 did in fact suppress domestic UAN prices. Id. at 24.

The Court finds that the ITC reasonably chose to use full-year pricing data when evaluating the correlation between domestic UAN prices and natural gas prices. First, the ITC's broad discretion in choosing the time frame for its investigation and analysis has consistently been upheld. See Wieland Werke, AG v. United States, 13 CIT 561, 567, 718 F. Supp. 50, 55 (1989) (approving three-year period of investigation); British Steel Corp. v. United States, 8 CIT 86, 93, 593 F. Supp. 405, 410-11 (1984)

(approving analysis of calendar year data rather than quarterly data); Amer. Spring Wire Corp. v. United States, 8 CIT 20, 26, 590 F. Supp. 1273, 1279 (1984), aff'd sub nom., Armco Inc. v. United States, 760 F.2d 249 (Fed. Cir. 1985) (approving analysis of calendar year data rather than quarterly data).  Neither the antidumping statute nor existing case law requires the ITC to examine half-year data if it reasonably finds that full-year data is probative.  See Amer. Spring Wire, 8 CIT at 26, 500 F. Supp. at 1279 ("[T]he ITC is not required by the statute to use any particular timeframe for its analysis, although it generally focuses on annual time periods.").

Second, the Court finds that the ITC appropriately exercised its discretion in the selection of the full-year period of analysis in this case.  As an initial matter, the Court notes that the ITC's general practice is "to conduct an annual analysis of the volume and effects of imports over the period of investigation." Steel Auth. of India v. United States, 25 CIT 472, 477, 146 F. Supp. 2d 900, 907 (2001) (emphasis added).  It was reasonable for the ITC to follow standard procedure by initially examining the full-year periods in this case.  However, unlike the ITC's investigation in Timken Co. v. United States, 27 CIT ___, 264 F. Supp. 2d 1264 (2003), the ITC did not ignore more

detailed information that it had relied on in an earlier phase of the proceeding.  Rather, while employing an overall annual analysis, the ITC also specifically addressed the 2001 half-year data and arguments advanced by Plaintiff.  See Views of the Commission at 27 ("The petitioners argue that the domestic industry's condition continued to deteriorate after U.S. natural gas prices normalized by the second half of 2001 and that subject imports remained a significant presence in the U.S. market.  However . . .").  The ITC simply disagreed with Plaintiff's interpretation of this data.  Using Plaintiff's data, the ITC found that subject imports declined between the third and fourth quarters of 2001, citing market factors[5] which reasonably explained the delayed response time to falling (but, the Court notes, nonetheless quite high) natural gas prices.  Id.  As such, the Court finds that "plaintiff's position is one which would necessitate judicial reweighing of the evidence to take into account the factors and approach it favors, but this [C]ourt is not at liberty to reweigh evidence in an action such as this."  Roses, Inc. v. United States, 13 CIT 662, 667, 720 F. Supp. 180, 184 (1989) (finding it permissible for the ITC to rely on annual, as opposed to quarterly, financial data when making

---

[5] These factors are discussed more fully infra at III.C.1.

its analysis).

Finally, the Court finds that the ITC's determination adequately met the antidumping statute's requirement that "significant" price depression/suppression be considered in the analysis of subject imports' price effects.  19 U.S.C. § 1677(7)(C)(ii)(II).  Although half-year data was not used, the record shows that the ITC did consider changes in domestic prices and per unit profit margins during the period of investigation.  See Views of the Commission at 22 n.106 (explaining that Plaintiff's average unit price data is useful for examining price trends, but not as a surrogate for price comparisons); id. at 23 n.108 (analyzing COGS and sales unit values during the period of investigation); Def.'s App., List 2, Doc. 108 (ITC Staff Report for INV-AA-031 dated Mar. 11, 2003) at C-2.  The ITC determined that the price depression/suppression caused by subject imports was not "significant[.]"  Views of the Commission at 23.  Such a determination does not mean that price depression/suppression was nonexistent; rather, the depressive or suppressive effects of subject imports did not rise to an actionable level under the antidumping statute.  Plaintiff's own evidence of price suppression reinforces this conclusion, given that Plaintiff points only to data from the second half of 2001 to prove price

suppression, Pl.'s Br. at 24, despite the presence of high volume subject imports in response to climbing natural gas and UAN prices during much of the period of investigation. Id. at 4.  When weighed against the ITC's full data set from the period of investigation – covering three years and an eight month interim period – this data is insufficient to undermine the substantial evidence supporting the ITC's price depression/suppression analysis.

Accordingly, the ITC's selection of full-year data for its analysis of price suppression/depression is in accordance with law.

**C.    The ITC's Determination that the "Significant" Volume of Subject Imports Was Mitigated by Market Conditions Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

In making its final injury and threat determination, the ITC was required to analyze the volume of subject imports, specifically whether the volume (or increase in volume) of subject imports was significant during the period of investigation, either in absolute terms or relative to domestic UAN production or consumption.  See 19 U.S.C. § 1677(7)(B)(i)(I); id. § 1677(7)(C)(i).  In the Final Determination, the ITC found that "[t]he increase in volume of the subject imports both absolutely and relative to domestic consumption over the period of investigation

was significant." Views of the Commission at 17. However, the ITC noted that the significance of this volume "must be viewed in the context of prevailing market conditions" – specifically the sharp spike in natural gas prices resulting in higher UAN costs, domestic production cutbacks and high UAN prices. Id. at 17-18. The ITC noted that the total volume of subject imports rose and fell roughly in tandem with natural gas prices, citing as a specific example the declining volume of subject imports shipped to Gulf Coast cities during the second half of 2001. Id. at 18, 27. The ITC also noted that long lead times between orders and deliveries could have accounted for the somewhat delayed response of subject imports to falling gas prices in the second half of 2001. Id. at 27. To draw these conclusions, the ITC relied on data from 2001 and 2002, which included the date the petition was filed. Id. at 17-18. However, the ITC found that the decline in subject imports predated petition filing and was instead related to natural gas price effects. Id. at 18 n.85.

Plaintiff advances two arguments for why the ITC's volume analysis is not supported by substantial record evidence or otherwise in accordance with law. For the reasons set forth below, the Court sustains this aspect of the Final Determination.

### 1.   The ITC's Analysis of the Relationship between Natural Gas Prices and Subject Import Volume Is Reasonable.

Plaintiff contests the ITC's conclusion that the volume of subject imports rose and fell in tandem with natural gas prices.  Pl.'s Br. at 31.  Plaintiff argues that record evidence instead shows that the total volume of subject imports reached a historical peak in the second half of 2001, as natural gas prices were falling, and remained at "exceptionally high" levels through the first quarter of 2002.  Id. at 32.  Plaintiff argues that only non-subject imports of UAN declined along with natural gas prices – subject imports remained at high volumes and only began to significantly decrease after the antidumping petition was filed.  Id.  For example, Plaintiff notes that subject imports into Gulf Coast cities declined only 1.4 percent during the second half of 2001.  Id. at 34.

The Court finds that the correlation made by the ITC between natural gas prices and subject import volume is reasonable.  First, the Court notes that Plaintiff places great, but misdirected, weight on the fact that subject imports were "exceptionally high" during key points in the period of investigation.  Pl.'s Br. at 32.  This fact is simply not in dispute.  In the Final Determination, the ITC itself concluded that the volume of subject imports was

"significant" – a factor taken into account in its injury analysis. Views of the Commission at 17. By examining the mitigating role of natural gas price effects on the significance of subject import volume, the ITC did not impermissibly qualify its conclusion; rather, the agency exercised its statutory right to consider "such other economic factors as are relevant to the determination." 19 U.S.C. § 1677(7)(B)(ii). Plaintiff does not allege (nor could it) that the ITC abused its discretion in considering natural gas prices to be such an economic factor.

Second, the Court finds that the ITC's conclusion regarding natural gas price effects is supported by record evidence. Recognizing the importance of natural gas prices as an economic factor, the ITC indicated during the Preliminary Determination its intention to "fully explore" the role of natural gas prices on the domestic UAN industry during the final investigation. Preliminary Views of the Commission at 25-26. The ITC dutifully pursued this line of analysis during the final investigation, collecting information from questionnaire respondents on, inter alia, the net cost of natural gas inputs, use of natural gas purchase options, contract terms of natural gas purchases and the effect of natural gas prices on UAN production. See, e.g., Pl.'s App., App. 12 (Form of Final

Questionnaire) at 10-11, 21-23 (requesting information related to natural gas usage and effects); id., App. 16 (ITC Staff Report dated Feb. 7, 2003) at V1-V4 (discussing natural gas as a raw material cost affecting pricing); Def.'s App., List 2, Doc. 112 (ITC Staff Handwritten Notes from Dec. 2002-Mar. 2003) (discussing UAN and natural gas data).  The ITC compared this information on natural gas with the trends in domestic UAN prices, domestic UAN consumption and the volume of subject imports discerned from other information collected from questionnaire respondents.  See, e.g., Pl.'s App., App. 12 (Form of Final Questionnaire); Def.'s App., List 2, Doc. 108 (ITC Staff Report dated Mar. 14, 2003) at V-3, V-18; id., List 2, Doc. 98 (Plaintiff's Pre-Hearing Brief to the ITC dated Dec. 13, 2003) at Ex. 6 (cited by ITC in the Final Determination); Views of the Commission at 22 n.103.  Based on this substantial evidence, the ITC found a positive correlation between natural gas prices and the volume of subject imports.  The ITC had sufficient evidentiary grounds on which to base this conclusion.

Finally, the Court finds that the failure of subject imports to decline exactly in tandem with natural gas prices does not refute the existence of a positive correlation.  The record reveals, and Plaintiff concedes,

that subject imports did begin to slowly decline shortly after the fall in natural gas prices and before the filing of the antidumping petition.  Id. at 18 n.85 (citing evidence of volume levels supplied by Plaintiff during the final investigation).  Further, even among non-subject imports, which Plaintiff notes declined at a faster rate than subject imports, the timing of market exit varied among imports from different countries.  Def.'s App., List 2, Doc. 133 (Plaintiff's Post-Hearing Brief dated Feb. 27, 2003) at Ex. 15.  This evidence lends support to the ITC's finding that different contractual terms, including ordering lag times, delayed the response of subject imports from different producers in different countries to changing market conditions in the U.S.  Views of the Commission at 27 n.127.  Although Plaintiff counters that certain evidence indicates that contract lead times were too short to account for the delay, Pl.'s Br. at 41, there is also record support for the ITC's conclusion.  See Def.'s App., List 2, Doc. 108 (ITC Staff Report for INV-AA-031 dated Mar. 11, 2003) at II-28 (shipment times ranged from [  ] to [        ]); Appendix to Memorandum of Defendant Intervenors JSC Nevinnomysskij Azot, Inc. and Transammonia, Inc. in Opposition to Plaintiffs' Motion for Judgment on the Agency Record, List 1, Doc. 121 (Commission Hearing Transcript for

INV-731-TA-1006, 1008 and 1009 (Final)) at 187-88 (witness noting lead times of [        ] are only for physical delivery and that orders can be placed up to [          ] in advance).  As discussed infra at III.A.1, the ITC is owed deference in its weighing of the record evidence and Plaintiff has failed to raise sufficiently serious concerns to disturb the ITC's finding.

Accordingly, the ITC's analysis of the relationship between natural gas prices and subject import volume is supported by substantial evidence.

### 2. The ITC Reasonably Considered Pre- and Post-Petition Data When Comparing Relative Subject Import Volumes.

Plaintiff argues that the ITC erred in considering subject import volumes for the January-September 2002 interim period in its volume analysis.  Pl.'s Br. at 33. Plaintiff contends that the decrease in subject imports observed during this period was aberrational; subject import volumes were distorted by the threat of an antidumping petition, which was ultimately filed in April 2002.  Id.

The Court finds that the ITC exercised appropriate discretion in evaluating post-petition data related to declining subject import volumes.  The antidumping statute expressly grants the ITC discretion in weighing post-

petition data.  19 U.S.C. § 1677(7)(I) ("[T]he ITC may

reduce the weight accorded to the data for the period after

the filing of the petition in making its determination . .

.") (emphasis added).   Cases applying this provision have

recognized the ITC's significant discretion in its weighing

of such information.  See Altx, Inc. v. United States, 25

CIT 1100, 1105, 167 F. Supp. 2d 1353, 1361 (2001)

(recognizing that the ITC "is not required to discount the

relevant data even if the agency finds a change in data to

be related to the pendency of the investigation").  Here,

the ITC plainly established that subject imports began to

decline before the petition filing.  Views of the

Commission at 17-18.  In the Final Determination, the ITC

took into consideration the possibility that the threat of

the petition may have "contributed to the drop in subject

imports" toward the end of the period of investigation.

Id. at 18 n.85.  The ITC nonetheless concluded that the

decline in subject imports was due, at least in part, to

factors other than the antidumping petition, such as

natural gas price effects.  Id.  This conclusion was within

the ITC's discretion.

     Accordingly, the ITC appropriately considered post-

petition data which was consistent with pre-petition data

demonstrating a trend of declining subject imports.

D.  **The ITC's Negative Impact Determination Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

In making its final injury and threat determination, the ITC was required to consider the impact of subject imports on domestic UAN producers.  19 U.S.C. § 1677(7)(B)(i)(III).  As part of this evaluation, the ITC was further required to "evaluate all relevant economic factors which have a bearing on the state of the industry in the United States."  Id. § 1677(7)(C)(iii).  In the Final Determination, the ITC analyzed factors such as "output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, and research and development."  Views of the Commission at 23. The ITC found that "[w]hile the domestic industry generally reported losses during the period of investigation, the losses [were] not attributable to any significant degree to the subject imports."  Id. at 25.  To make this conclusion, the ITC drew on the results of its pricing and volume analysis.  Specifically, the ITC noted that subject imports had not had an adverse effect on industry prices, as demonstrated by the relative lack of underselling and minimal price depression/suppression.  Id.  The ITC also noted that, during the period of investigation, the

domestic industry's financial condition was at its worst in

1999, when subject imports had minimal presence (less than

[     ] percent of the domestic market).  Id. at 26.

Recognizing that the domestic industry's profitability also

declined later in the period of investigation, the ITC

attributed this to natural gas price effects, rather than

subject imports.  Id.  To support this finding, the ITC

noted that the domestic industry experienced significant

production curtailments during the period of investigation

due to high natural gas prices.  Id. at 24.  In general,

the ITC found that unscheduled production curtailments

totaled approximately 154,000 tons per month from September

to March 2001 and created "a perception in the marketplace

(if not reality) that domestic supply was unreliable."  Id.

at 25.  Based on these findings, the ITC found that subject

imports did not have a significant adverse impact on the

domestic industry.  Id. at 28.

        Plaintiff advances one major argument[6] for why the

---

[6] Plaintiff also presents three additional arguments countering the
ITC's impact analysis.  First, Plaintiff argues that the ITC's flawed
underselling analysis, used to support the ITC's impact analysis,
renders the ITC's negative impact determination unsustainable.  Pl.'s
Br. at 36.  Since the Court sustains the ITC's underselling analysis,
as discussed infra at III.A, this argument is not addressed.  Second,
Plaintiff argues that the ITC's erroneous analysis of full-year data,
rather than half-year data, obscured the true impact of subject imports
on the domestic industry. Since the Court sustains the ITC's decision
to use full-year data, as discussed infra at III.B, this argument is
not addressed.  Id. at 39.  Third, Plaintiff contends that the ITC
improperly considered volume data from the interim period, which
included the date of the antidumping petition filing, when making its

ITC's impact analysis is not supported by substantial evidence or otherwise in accordance with law.  For the reasons set forth below, the Court sustains this aspect of the Final Determination.

Plaintiff argues that the ITC based its impact analysis, in part, on the incorrect assertion that domestic UAN production was significantly curtailed as a result of high natural gas prices.  Pl.'s Br. at 36.  Plaintiff contends that record evidence shows that a total of only [

] tons of domestic production were curtailed specifically due to high natural gas prices during September 2000 to March 2001 – an amount far less than that found by the ITC.  Id.  Plaintiff further contends that the record indicates that millions more tons were curtailed as a result of inventory controls and poor market conditions – causes which Plaintiff attributes to subject imports.  Id. at 37.  Plaintiff argues that this evidence was ignored by the ITC and contradicts the ITC's conclusion that natural gas prices were the cause of the industry's poor condition during the period of investigation.  Id.

The Court finds that record evidence concerning domestic UAN production curtailments, adequately addressed

_____

impact determination.  Id. at 43.  Since the Court sustains the ITC's volume analysis and use of data from the interim period, as discussed infra at III.C, this argument is not addressed.

in the Final Determination, supports the ITC's impact analysis. Plaintiff is correct that only [      ] tons of domestic production curtailments were directly attributable to natural gas price effects. See Def.'s App., List 2, Doc. 108 (ITC Staff Report for INV-AA-031 dated Mar. 11, 2003) at III-3. However, the ITC does not impermissibly attribute a larger amount of production curtailments to this specific root cause. Rather, building on a detailed comparison of domestic UAN production curtailments, capacity and inventory data during the period of investigation, the Final Determination generally notes that significant unscheduled production curtailments occurred during the period of investigation, coinciding with the natural gas price peak. Views of the Commission at 24. This observation is supported by substantial evidence. See Def.'s App., List 2, Doc. 108 (ITC Staff Report for INV-AA-031 dated Mar. 11, 2003) at III-3-III-5, Table C-2. It is Plaintiff which baldly asserts a cause for these additional curtailments – subject imports. Yet, Plaintiff cites to no record evidence explaining that all production curtailments attributed to "inventory control" and "market conditions" are best understood to be caused solely by subject imports. A review of Plaintiff's own evidence reveals why it is unable to provide record support for this correlation. In

Exhibit 17 of Plaintiff's Pre-hearing Brief to the ITC,

which summarized the detailed production curtailment

information reported by U.S. producers for October 2000 to

September 2002, Plaintiff categorizes curtailments

according to their reported root cause.  Id., List 2, Doc.

98 (Plaintiff's Pre-Hearing Brief to the ITC dated Dec. 13,

2003), Ex. 17 at 3.  Predictably, "natural gas prices" and

"inventory control/market conditions" are listed as

categories; however, the summary also includes a separate

line item for curtailments caused by "subject imports."

Id.  Where Plaintiff makes categorical distinctions among

the root causes of production curtailments earlier in an

antidumping investigation, the Court will not allow it to

later conflate such categories to achieve a desired result.

        Accordingly, the ITC's consideration of domestic

production curtailments is supported by substantial

evidence.

**E.    The ITC's Negative Threat Determination Is Supported
       by Substantial Evidence and Otherwise in Accordance
       with Law.**

        In making its final injury and threat determination,

the ITC was required to analyze whether further dumped

imports of UAN were imminent and whether material injury by

reason of such imports would occur.  19 U.S.C. §

1677(7)(F)(ii).  In the Final Determination, the ITC

concluded that the domestic UAN industry was not threatened with material injury by subject imports. Views of the Commission at 29. In reaching this conclusion, the ITC found that there was a limited amount ([   ] percent) of additional production capacity from the subject countries that could be diverted to the U.S., since approximately two-thirds of production from the subject countries had already been exported during the period of investigation. Id. at 31. The ITC also found that additional UAN was unlikely to shift from the European Union ("EU") to the U.S., despite the imposition of EU antidumping orders on subject imports, since these orders had been in place during the period of investigation and had not caused such a shift. Id. at 32. Because it found that subject imports had not caused material injury to the domestic industry during the period of investigation and were not likely to dramatically increase in the future, the ITC made a negative threat determination. Id. at 33-34.

Plaintiff advances two arguments for why the ITC's threat determination is not supported by substantial record evidence or otherwise in accordance with law.[7] For the

_____

[7] Plaintiff also advances a third argument that threat of material injury is likely because the domestic UAN industry was clearly injured by the subject imports during the period of investigation (contrary to the ITC's conclusion). Pl.'s Br. at 45. Since the Court affirms the ITC's negative present material injury determination, as discussed

reasons set forth below, the Court sustains this aspect of the Final Determination.

### 1.   The ITC Considered and Reasonably Weighed the Record Evidence Concerning Available Capacity.

Plaintiff argues that the ITC erred by not considering all available capacity data when assessing the likelihood of future imports.  Pl.'s Br. at 46.  Specifically, Plaintiff contends that the ITC ignored: (1) excess capacity data for the Ukraine and (2) the existence of a Russian producer with excess capacity who failed to respond to the final questionnaire.  Id. at 46-47.

The Court finds that the ITC adequately considered available capacity data.  First, contrary to Plaintiff's contention, the ITC did not focus solely on questionnaire responses when cumulating capacity estimates.  In fact, the ITC relied on Plaintiff's own estimate of Ukrainian capacity when it did not receive adequate questionnaire responses from importers in that subject country.  See Views of the Commission at 31 n.142 ("Even assuming excess capacity in the Ukraine, one third of the total capacity in the Ukraine would only be equivalent to another [    ] percent of domestic apparent consumption."); id. at 31 n.143 ("The Ukrainian producers did not respond to the

_____

infra at III.D, this argument is not addressed.

[ITC]'s questionnaires, but petitioners estimate that production capacity for UAN in the Ukraine is [      ] short tons.").

Second, the ITC acted appropriately when it did not include Plaintiff's capacity estimate for the Russian producer who did not respond to the final questionnaire. Plaintiff provided no record evidence that this producer had [                    ] or was planning to do so in the future. See Def.'s App., List 2, Doc. 124 (ITC Staff Report for INV-AA-036 dated Mar. 21, 2003) at VII-3. The ITC properly declined to consider possible, but undocumented, excess capacity as evidence of a likely increase in imports. See 19 U.S.C. § 1677(7)(F)(ii) (threat determination may not be made "on the basis of mere conjecture or supposition"); see also BIC Corp. v. United States, 21 CIT 448, 464, 964 F. Supp. 391, 405 (1997) (affirmative threat determination requires "positive evidence tending to show an intention to increase levels of importation") (citation omitted).

Accordingly, the ITC's consideration of available capacity data was in accordance with law and the resulting capacity data set provides substantial evidentiary support for the ITC's threat determination.

   *2.    The ITC Considered and Reasonably Weighed*

### *Anecdotal Evidence Concerning the Likelihood of Future High Volume Subject Imports.*

Plaintiff argues that the ITC erred by not according proper weight to Plaintiff's anecdotal evidence of likely high volume future imports.  Pl.'s Br. at 47.  Specifically, Plaintiff contends that the ITC: (1) incorrectly interpreted the terms of a key supply contract between a non-domestic UAN producer and a significant importer, substantially underestimating the amount of likely future imports; (2) placed undue emphasis on the role of high transportation costs in deterring UAN imports, citing the high volume of imports experienced during the period of investigation as counterevidence; and (3) dismissed the significance of EU antidumping measures imposed on subject imports.  Id. at 47-49.

The Court finds that the ITC adequately considered Plaintiff's anecdotal evidence of material threat.  First, the ITC's interpretation of the contested contract, although questionable, does take into consideration the fact that the importer was importing more than [

                    ] during the period of investigation.
See Views of the Commission at 33 ("[

]"). Plaintiff offers no evidence to explain why the contract in question would encourage any importer to bring substantially more UAN into the U.S. than the significant amounts imported during the period of investigation. Given the ITC's recognition that the significant importer in question (among others) had imported substantial quantities of UAN during the period of investigation, the contested contract did not demonstrate that an increase in subject imports above this already significant amount was likely or would likely cause material injury.

Second, the ITC reasonably found that high transportation costs would deter future UAN imports. In the Final Determination, the ITC noted that UAN is largely composed of water and must be transported long distances to reach key U.S. cities. Views of the Commission at 15. The ITC also noted that some suppliers even use financial swap instruments to minimize the effects of high UAN transportation costs. Id. The ITC found that it was cost-effective to transport high quantities of subject imports to the U.S. during the period of investigation only because UAN prices had reached record highs. Id. at 18. The Court finds that this conclusion is supported by substantial

record evidence.  See, e.g., Def.'s App., List 2, Doc. 108

(ITC Staff Report for INV-AA-031 dated Mar. 11, 2003) at

II-1, V-5, V-7, V-10.  It was therefore reasonable for the

ITC to conclude that transportation costs would serve as an

obstacle to future imports as well and to base its threat

determination in part on this finding.

     Third, the ITC reasonably accorded little weight to

the significance of EU antidumping measures imposed on

subject imports.  Plaintiff's contention that EU

antidumping measures significantly increased the volume of

subject imports into the U.S. during the period of

investigation and would continue to do so is not supported

by record evidence.  The Final Determination notes that

"[n]otwithstanding the EU orders, subject import volumes in

the U.S. market dropped during the latter part of 2001 and

interim 2002."  Views of the Commission at 32.  Plaintiff

offers no explanation for why subject imports fell during

the period of investigation despite the continuation of EU

antidumping measures.  Rather, as discussed infra at III.B,

the record evidence supports the ITC's conclusion that the

volume of subject imports tracked natural gas prices and

corresponding UAN prices, rather than EU antidumping

duties.

     Accordingly, the ITC's consideration and treatment of

Plaintiff's anecdotal evidence concerning threat of

material injury is supported by substantial evidence.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court sustains the

<u>Final Determination</u>.  Judgment will be entered accordingly.

<u>/s/ Richard W. Goldberg</u>
**Richard W. Goldberg**
**Senior Judge**

**Date:      January 31, 2005**
**           New York, New York**